# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Jeanne Imperati, as Administrator of the
Estate of William Bennett,

                    Plaintiff,

v.

Scott Semple et al.,

                    Defendants.

Civil No. 3:18-cv-01847 (RNC)


November 3, 2020

## RULING AND ORDER ON *IN CAMERA* REVIEW

### I.   INTRODUCTION

This is a prison civil rights case.  The plaintiff, Jeanne Imperati, is the administrator of the

estate of her nephew, William Bennett.  (Am. Compl., ECF No. 59, at 1 & ¶ 125.)  Bennett died

of cancer on November 11, 2017 while in the custody of the Connecticut Department of Correction

("DOC").  (*Id.* ¶¶ 148, 149.)   Imperati sued several DOC officials, claiming that they violated 42

U.S.C. § 1983 and the Eighth Amendment by acting with deliberate indifference to Bennett's

serious medical needs.  (*See generally id.*)  Among the officials she sued was the now-retired DOC

Commissioner, Scott Semple.  (*Id.* ¶¶ 240-319.)

Imperati served document production requests on Semple in November 2019.  (ECF Nos.

77-8, 77-10.)  When nearly six months went by without a responsive production, Imperati moved

for an order compelling Semple to comply with all of her requests.  (ECF No. 77.)  The Court

resolved most of the issues raised in her motion in orders docketed at ECF Nos. 84, 85 and 108.

After those orders, only one issue remains: whether Semple may withhold seventeen specific

documents under claims of deliberative process privilege, attorney-client privilege or work product

protection.[1]   In its prior order at ECF No. 108, the Court directed Semple to submit those documents for *in camera* review.   After receiving the documents, the Court held a hearing and requested an additional round of briefing.   (ECF No. 117, 122.)   The parties have submitted their briefs (ECF Nos. 126, 136), and the issue is now ripe for decision.

For the reasons discussed below, the Court overrules Semple's objections and grants Imperati's motion to compel production of the documents bearing the following Bates numbers: 2997-99, 3004-05, 3006-08, 3980-81, 4021-23, 4310, 4328-29, 4335-43, 4344-60, 4361-81, and the last link of the e-mail chain in Document 3961-65.[2]   The Court sustains at least one of Semple's objections to production of – and therefore denies Imperati's motion to compel disclosure of – the documents bearing Bates numbers 4024-80, 4132-81, 4182-4259, 4260-4309, 4313-14, 4326-27 and 4382-4430, along with the first four links of the e-mail chain in Document 3961-65.   The Court's order is set forth more fully in Section V below.

## II.   FACTUAL BACKGROUND

### A.   Imperati's Allegations About Bennett's Illness and Death

Imperati alleges the following facts.   Her nephew, William Bennett, was a prison inmate who entered DOC custody in 2010.   (*Cf.* Am. Compl., ECF No. 59, ¶ 38.)   In 2015 he began to report that he was coughing frequently at night and having trouble swallowing.   (*Id.* ¶¶ 48-61.)   In

---

[1]      That is, only one issue remains to be decided by this magistrate judge with respect to the motion at ECF No. 77.   Semple objected to the order at ECF No. 108 (Defs.' Obj. to Ruling of Mag. J., ECF No. 109), and his objections are currently pending before Judge Chatigny.   Imperati also filed other discovery-related motions at ECF Nos. 135, 140 and 145.

When the Court directed Semple to submit documents for *in camera* review, there were nineteen documents at issue.   (*See* ECF No. 108, at 20.)   In his brief, Semple abandoned his privilege claims with respect to two of the nineteen (ECF No. 126, at 7 n.2), leaving seventeen claims to be decided.

[2]      The Court will permit Semple to redact some of these documents for medical privacy and other reasons, as explained in Sections IV and V.

June 2016, prison nurse Linda Oeser evaluated him and asked the DOC's Utilization Review Committee ("URC") to approve a referral to an ear, nose and throat specialist ("ENT").  (*Id.* ¶ 64.) The URC "rejected the request," and Imperati faults Nurse Oeser for not appealing or protesting the rejection.  (*Id.* ¶¶ 69, 71-72.)

Bennett went without specialized ENT treatment for months afterward, and his throat problems worsened.  (*Cf. id.* ¶¶ 77-93.)  During that period he was evaluated by two non-specialist providers, Nurse Cynthia L'Heureux and Dr. Carey Freston, but Imperati contends that both providers failed to appreciate the seriousness of Bennett's throat symptoms.  (*See id.*)  She alleges, among other things, that Dr. Freston "merely prescribed Claritin and Protonix and was to follow up in three months."  (*Id.* ¶ 78.)  On December 2, 2016, the URC finally approved a referral to an ENT, but the approval "sat idle" on Dr. Freston's and Nurse L'Heureux's desks while Bennett's condition continued to deteriorate.  (*Id.* ¶ 90.)

On January 23, 2017, Bennett went to the emergency room at Day Kimball Hospital "because of problems breathing."  (*Id.* ¶¶ 94-95.)  Day Kimball doctors diagnosed a large and malignant tumor in his throat (*id.* ¶ 96), and eleven months later he died from "complications of invasive squamous cell carcinoma of the larynx."  (*Id.* ¶¶ 148-149.)  Imperati alleges that "[t]he URC denial of care" ended up being "effect[ively] a death sentence for" her nephew, "because by the time [his carcinoma] was diagnosed, it was difficult to treat, and his chances of survival had been reduced by its aggressive attack on his systems."  (*Id.* ¶¶ 73, 151.)

Dr. Freston and Nurses Oeser and L'Heureux are not the only people Imperati blames for Bennett's death.  She also faults the now-retired DOC Commissioner, Scott Semple.  (*See generally id.*)  Her complaints against Semple focus on his management of the DOC's relationship with its former health care contractor, Correctional Managed Health Care ("CMHC"), an arm of

the University of Connecticut Health Center.[3]  Imperati says that the Memorandum of Agreement ("MOA") between DOC and CMHC committed both entities to provide inmate care "consistent with the generally accepted practice in the State" (*id.* ¶ 153) – in other words, she views the MOA as obliging DOC and CMHC to meet the same "community standard of care" that applies outside the prison setting.  (*Id.* ¶ 154.)  She alleges that Semple knew that CMHC was not meeting the community standard of care, and that he failed to fix the problems with CHMC in time to help her nephew.  Furthermore, she claims that DOC's shortcomings arose from Semple's failure to address structural defects in the MOA that he inherited from his predecessors, including the lack of any provision by which DOC could force CMHC "to take corrective action."  (*Id.* ¶ 161.)  She asserts that these and other failures render Semple liable under Section 1983 pursuant to the supervisory liability principles articulated in *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995).  (*See, e.g., id.* ¶¶ 155, 186, 301; *see also* Pl.'s Obj. to Mot. to Dismiss, at 19-29 (outlining theory of *Colon* liability).)

Imperati's operative complaint cites four principal sources for her claim that Semple knew about CMHC's failings.  First, she claims that Semple was told as much by DOC's medical director, Dr. Kathleen Maurer.  (Am. Compl., ECF No. 59, ¶ 155.)  Second, her counsel was also counsel for a plaintiff in another DOC cancer case, *World v. CMHC*, No. 3:16-cv-519 (JCH) (D. Conn.), and she contends that discovery in that case revealed Semple's awareness and understanding "that the care being given to inmates by CMHC doctors and medical staff was

---

[3]     "Correctional Managed Health Care (CMHC) provide[d] global medical, mental health, pharmacy and dental services at 17 COC facilities statewide."  Univ. of Conn. Health Ctr., *July 2009 – June 2010 CMHC Annual Report*, at 1, *available at* https://portal.ct.gov/-/media/DOC/Pdf/CMHCAnnualReport2010pdf.pdf (last visited Nov. 3, 2020).  The MOA between DOC and CMHC evidently terminated in 2018.  (*See* ECF No. 59, ¶ 190 (alleging termination of MOA)); *see also* Dave Altimari & Josh Kovner, *With Growing Concerns Over Treatment, State Moves Inmate Medical Care from UConn Health to Correction Department*, HARTFORD COURANT (Feb. 1, 2018), https://www.courant.com/news/connecticut/hc-news-uconn-health-inmates-contact-20180201-story.html.

substandard."  (*Id.* ¶ 155.)  Third, she says that an audit of DOC operations by the Office of the

State Auditor concluded that the DOC-CMHC agreement "was harming patients," and that Semple

therefore "knew the myriad ways the [agreement] failed inmates."  (*Id.* ¶¶ 186-87.)  Fourth, she

claims that Semple learned about CMHC's failings from a document she refers to as the "CJI

Report."[4]  (*Id.* ¶¶ 177-81.)

Since the CJI Report is a focal point of the parties' remaining discovery disputes, the Court

will discuss it in more detail in Section II.C below.  For the moment, it is enough to note that

Semple's knowledge of CMHC's alleged failures – what he knew and when he knew it, not only

about the failures themselves but also about the MOA's role in producing them – is relevant

discovery under Rule 26(b)(1), and indeed he has never seriously contended otherwise.

### B.       Imperati's Motion to Compel (ECF No. 77)

On November 14, 2019, Imperati served a deposition notice on Semple.  (ECF No. 77-8.)

Attached to the deposition notice was a set of document production requests seeking twenty-four

classes of documents.  (*Id.*) (the "Deposition Requests").  The twenty-fourth request related to her

claims about Semple's awareness of CMHC's failings.  It sought production of "[a]ll documents

and records in [Semple's] control, custody or possession demonstrating the medical care given to

inmates within the Connecticut Department of Correction system has fallen below the statutory or

constitutional standard of care."  (*Id.* at 9.)

Semple did not produce documents or serve objections by December 16, 2019, as he was

required to do under Rule 34.  He did not produce or object in January, February, March or April

either.  Imperati's counsel says that he conferred with Semple's counsel over these failures "many

---

[4]       As discussed *infra*, "CJI Report" is the name that the parties have given to a report prepared
by the Criminal Justice Institute, Inc. ("CJI"), a consulting firm located in Hagerstown, Maryland.

times." (ECF No. 77-2.) When these conferences failed to produce a response, Imperati filed a motion to compel. (ECF No. 77.) Judge Chatigny referred the motion to the undersigned. (ECF No. 78.)

Upon receiving the referral, the Court noted that "according to the plaintiff's motion, few of the discovery requests at issue have been objected to." (ECF No. 81.) To help determine the true scope of the dispute, it directed Semple to file a status report "specifically identifying the discovery requests to which [he] still maintain[s] an objection" and "stat[ing] the date on which the objection was first asserted." (*Id.*) In his response to the Court's order, Semple did not object to any of Imperati's twenty-four deposition document requests on grounds of irrelevance or lack of proportionality. (ECF No. 82, at 2-7.) His only objections were attorney-client privilege, deliberative process privilege and work product objections, and he stated that he was asserting them "at this time." (*Id.* at 2.) In other words, he acknowledged that he was asserting privilege objections for the first time, over five months after objections were due under Rule 34, and over five months after his privilege log was due under Local Rule 26(e).

After reviewing Semple's report, the Court entered an order at ECF No. 85. Since Semple's only objections to Imperati's deposition document requests were privilege and work product objections, the Court ordered him to produce all non-privileged documents responsive to Imperati's requests. (ECF No. 85, at 2-3 (Semple must "produce to the plaintiff . . . all documents that are both (a) responsive to [the requests] and (b) not subject to his attorney-client privilege, deliberative process privilege, and work product objections.").) The Court then explained how it would address his privilege and work product claims. It directed that, "[f]or each document withheld under a claim or attorney-client privilege, deliberative process privilege or work product protection, Commissioner Semple shall . . . provide the plaintiff with a privilege log that complies

with D. Conn. L. Civ. R. 26(e)."  (*Id.*)  It also directed Semple to "file a memorandum of law explaining why these three objections were not waived by his failure to assert them seasonably." (*Id.*)  In other words, the Court ordered Semple to produce all responsive documents to which he was not asserting privilege or work product protection, and it gave him a chance to support any privilege claims with a log and a brief, even though those claims were months overdue.

Semple then filed his brief, and it revealed that he had yet to even collect and review the documents Imperati had requested.  (ECF No. 86, at 13.)  In an evident effort to explain why he could not provide more detail about his privilege claims in a privilege log or otherwise, his counsel wrote that she could not "assert that the attorney-client privilege applies to a document without first identifying the privilege and reviewing the document itself."  (*Id.*)  Put differently, counsel could not provide more detail because she had not yet looked at the responsive documents to determine whether they included any privileged communications.

The Court nevertheless gave Semple yet another chance to support any privilege claims.  It entered an order requiring him to file a Local Rule 26(e)-compliant privilege log on the docket by June 19, 2020.  (ECF No. 91.)  Semple missed that deadline, but he filed three privilege logs the next afternoon.  (ECF Nos. 97-9, 97-10, 97-11.)  Fifteen days later, he filed yet another log.  (ECF No. 102-1.)

On July 16, 2020, the Court ruled on the question of whether Semple had waived all of his privilege claims through delay.  (ECF No. 108.)  It held that while Semple had waived privilege with respect to certain other discovery requests, he had not categorically waived his privileges with respect to the Deposition Requests.[5]  (*Id.* at 17.)  The Court observed, however, that "[j]ust because

---

[5]     The Deposition Requests were not the only document production requests that Imperati served on Semple.  She served a first set of document production requests soon after the discovery

Semple has not waived his privilege claims with respect to the Deposition Requests does not mean that those claims are necessarily valid." (*Id.*)  In particular, it noted that Semple's logs did not provide enough information to support his deliberative process privilege claims with respect to nineteen specific documents.  (*Id.* at 19.)  It ordered him to submit them for *in camera* review, thus providing him with yet another chance to sustain his claims.  (*Id.* at 19-20.)

Semple submitted the documents, and upon reviewing them the Court learned that they included several drafts and copies of the CJI Report.  The documents had not been expressly identified as such in Semple's logs.  (*See* ECF Nos. 97-11, 102-1.)  Document 4132-4181, for example, had been identified as a communication between Dr. Maurer and Nurse Tim Bombard arising out of Semple's efforts to "secure the services of an independent consultant to review medical cases within the Department of Correction/CMHC . . . to render advice and assistance in the reimagining and rebuilding of medical services within the DOC." (ECF No. 97-11, at 10-11.) But the log entry did not disclose that the "independent consultant" was CJI, nor did it disclose that the document was an e-mail to which a draft of the CJI Report had been attached.

Having thus learned that Imperati's motion implicated the contentious issue of the discoverability of the CJI Report, the Court requested another round of briefing.  It asked Semple for "a brief that takes your very best shot at explaining why the deliberative process privilege applies to these 19 documents," including the drafts and copies of the CJI Report.  (Hrg. Tr., ECF No. 122, at 10:23-11:1.)  It also asked Semple to address three questions:  "First, for each document, what was the specific agency decision to which it related?  Second, for each decision . . . what policy was ultimately adopted. . . . And then third . . . why the balance of factors doesn't

---

period opened in February 2019 (*see* ECF No. 77-9), and a later set of requests after Semple's first deposition session.  (ECF No. 77-10.)

weigh in favor of disclosure in this case." (*Id.* at 11:21-12:3.)  It added that if he wished to "tak[e] another run" at supporting his attorney-client privilege and work product claims "at this late date," he could do so in his brief.  (*Id.* at 11:9-13.)  In short, the Court allowed Semple yet another chance to support his deliberative process privilege, attorney-client privilege and work product claims with respect to all nineteen documents, including the drafts and copies of the CJI Report.

The Court also directed Semple to file another privilege log.  His first set of logs had described several documents in an "extraordinarily vague way" (*id.* at 5:1), and the Court therefore ordered him to "file and serve revised privilege logs with his . . . brief" and "describe the nineteen withheld documents more accurately."  (ECF No. 117.)  Semple filed a revised log, and in that log he withdrew his privilege claims with respect to two of the nineteen documents.  (ECF No. 129, at 2, 13-14 (withdrawing privilege objections to production of Documents 3960 and 4624-4632).) The revised log also changed the descriptions of some documents, as will be discussed below.

For now, it is sufficient to note that Semple has been given more than the usual number of chances to support his privilege claims.  Moreover, the Court has given him clear notice – if any was needed – that his deliberative process privilege claims may hinge on what he says about the "specific agency decision" being deliberated in each document.  When he submitted his brief and final privilege log, Semple could not have been under any illusion that he could be casual or careless in his description of the agency decision under consideration.  (Hrg. Tr., ECF No. 122, at 9:15-20 ("[W]e need to know precisely what decision was in front of the agency.").)

C.     The CJI Report

As noted, "CJI Report" is the name that the parties have given to a report prepared by the Criminal Justice Institute, Inc.[6]  According to Imperati, Semple hired CJI "to review the 20 or so cases of worst medical malpractice in the DOC system during the past several years."  (Am. Compl., ECF No 59,  ¶ 177.)  CJI reviewed the cases and provided DOC with a written report.[7] (*See* ECF No. 129, at 13 (privilege log entry for Document 4361-4430).)  Although she has not seen the report, Imperati nonetheless claims that it must have given Semple "first-hand knowledge that . . . care at [Bennett's prison] was substandard."  (Am. Compl., ECF No 59, ¶ 181.)

By the time Imperati filed this lawsuit, others had tried and failed to discover the report. In 2017, Hartford Courant reporter Josh Kovner sought the document through a Freedom of Information Act request, but the FOI Commission sustained Semple's attorney-client privilege claim.  (*See* FOIC Final Decision, Ex. E to Defs.' Suppl. Br., ECF No. 126-5.)  And in early 2018, Judge Merriam held in the *World* case that information about the report was protected by the work product doctrine.  (*See* Hrg. Tr., ECF No. 87, *World v. CMHC*, No. 3:16-cv-00519 (JCH/SALM), at 7-9) (declining to compel answers to deposition questions about the report).

When Imperati filed her original complaint in this case, she referenced Semple's attorney-client privilege claim.  (Compl., ECF No. 1, ¶ 208.)  She did not contend that the claim was unmeritorious.  Rather, she alleged that Semple had "hid[den]" the CJI Report "behind the

---

[6]     CJI actually provided two reports to DOC.  The first was an "assessment of [the] quality [of the] healthcare provided to twenty-five inmates."  (ECF No. 129, at 13) (privilege log entry for Document 4361-4430).   The second contained CJI's "recommendations for improving the proposed MOU with CMHC."  (*Id.*)  When the parties use the term "CJI Report," they are evidently referring only to the first of the two reports.  The Court will follow their convention; it will refer to the first report as the "CJI Report," and will refer to the second as the "MOA Analysis."

[7]     Semple says that "[t]here was never a final report issued by the CJI."  (ECF No. 126, at 6 n.1.)  He maintains that even the last version was a "draft[]."  (*Id.* at 6.)

attorney-client privilege," and that his assertion of privilege should be regarded as proof of his knowledge of the dire state of inmate health care.  (*Id.* ("Defendant Semple purposely hid the results behind the attorney-client privilege to avoid the bad publicity associated with the DOC failing to provide appropriate care to inmates in its custody.").)  When she amended her complaint in 2019, she made the same claim in even more strident terms.  (ECF No. 59, ¶ 179 ("Defendant Semple understood that the problems in DOC healthcare because of the MOA were so bad public release of them would result in outcry that people were needlessly dying, so he hid the most egregious data rather than make wholesale changes to protect people in his custody.").)

Perhaps because others had been unsuccessful in their attempts to discover it, Imperati did not expressly ask Semple to produce the CJI Report when she served her document production requests.  Her first set of requests principally sought documents specific to Bennett and his illness.  (ECF No. 77-11.)  Her second set sought six medical case assessments that had been provided to Semple by Dr. Maurer, along with some internal DOC documents about the MOA with CMHC.  (ECF No. 77-10.)  And the Deposition Requests likewise did not expressly seek production of the CJI Report.  (*See* ECF No. 77-8.)

The Deposition Requests did, however, seek production of   "[a]ll documents . . . demonstrating [that] the medical care given to inmates . . . has fallen below the statutory or constitutional standard of care."  (*Id.* ¶ 24.)  Semple does not dispute that the CJI Report is responsive to this request.  He also does not dispute that the report is relevant discovery, nor does he contend that Imperati's request is non-proportional under Rule 26(b)(1).  (*See* ECF No. 82, at 2, 7 (failing to object to request on lack-of-relevance or lack-of-proportionality grounds).)  His privilege and work product claims are his only bases for declining to produce the report in response

to Imperati's Deposition Request No. 24.  (*Id.* at 2 (sole objections are attorney-client privilege, deliberative process privilege and work product).)

The bases for Semple's privilege and work product claims have changed over time.  At the 2017 FOI hearing, his attorney – Assistant Attorney General Terrence O'Neill – testified that the CJI Report was commissioned "very much for litigation purpose[s]."  (ECF No. 126-4, at 57:16.) AAG O'Neill explained that in his "position supervising the litigation that's brought against" DOC, he "needed to hire an expert who could advise [him] on what salient facts need to be looked at in certain medical charts."  (*Id.* at 52:17 – 53:2.)  He underscored that the report was commissioned to address "[l]itigation and pending litigation and anticipated litigation" (*id.* at 57:17), and he substantially denied that it was prepared for any operational or policy-making purpose.  (*Id.* at 60:16-23.)

Yet by the time of the first privilege log in this case, the explanation had changed.  In that log, Semple explained that "in consultation with the [Office of the Attorney General]," "[i]n 2015-16 [he] . . . secured the services of an independent consultant to review medical cases."  (ECF No. 97-11, at 8 (entry for Document 4024-80).)  The purpose of that review was to "render advice and assistance in the reimagining and rebuilding of medical services within the DOC."  (*Id.*)  He claimed that the document was exempted from discovery not only by the attorney-client privilege and by the work product protections applicable to "[c]ommunications prepared to address litigation," but also by the "Deliberative Process" privilege protecting communications that "seek advice, and make policy decisions."  (*Id.*)  In other words, whereas in 2017 his attorney had testified that the CJI Report was directed at "[l]itigation and pending litigation and anticipated litigation" (ECF No. 126-4, at 57:17), and had substantially disclaimed any operational or policy-making purpose (*id.* at 60:16-23), in 2020 Semple was asserting that the report was at least partly

if not principally a "policy" document, commissioned to help him "reimagin[e] and rebuild[]" prison health care.  (ECF No. 97-11, at 8.)

The Court pointed out this inconsistency at the motion hearing.  It explained that "[o]n the one hand," Semple's "privilege log talks about reimagining DOC medical services," but "on the other hand . . . the document has been previously withheld from discovery in other cases on the ground that it was prepared to defend litigation."  (Tr. of Hrg., ECF No. 122, at 7:25 – 8:8.)  It further noted that the inconsistency complicated the deliberative process privilege analysis, because it left "unclear" the "decision that was before the Department of Correction to which this document is said to relate."  (*Id.* at 8:9-10.)  To clarify the issue, the Court asked Semple to file a brief explaining "the specific agency decision" to which the withheld documents related (*id.* at 11:21-22), along with a revised privilege log that "describe[s] the . . . documents more accurately." (ECF No. 117.)

In his brief, Semple returned to his initial, litigation-focused explanation.  (ECF No. 126.) He asserted that CJI was hired "to evaluate a series of cases . . . in matters that are in, and/or are likely, to lead to litigation."  (*Id.* at 5.)  He elaborated that "[t]he purpose of retaining the expert consultant was to provide AAG O'Neill detailed factual analysis and opinions based upon that analysis, upon which he could base legal opinions and advice to the Commissioner."[8]  (*Id.*)  And in contrast to his earlier claims about the document, which had been supported only by unconfirmed statements from his counsel, he supported these claims with his own affidavit and an

---

[8]      The CJI Report is addressed to DOC, not to the Attorney General's office or to AAG O'Neill.  But Semple explains that "[t]he only reason why this was a Department of Correction contract and not an Attorney General contract is that contracts for legal experts must go through the client agency as I was told that the Office of the Attorney General does not have the capacity to enter into contracts with experts."  (Aff. of S. Semple, ECF No. 126-2, ¶ 4.)  He says that although the CJI Report was addressed to DOC, its "purpose . . . was to provide information to Attorney O'Neill."  (*Id.*)

affidavit from AAG O'Neill.  (ECF Nos. 126-1, 126-2; *see also* ECF No. 126-3 (affidavit from DOC Director of Legal Affairs, Atty. Nicole Anker).)

Semple nevertheless continues to assert that the CJI Report is protected from discovery by the deliberative process privilege in addition to the attorney-client privilege and work product doctrine.  (ECF No. 126, at 5-25.)  He identifies the policy decision being deliberated as "the identification of inmate medical cases that in the opinion of the DOC medical staff, were concerning."  (*Id.* at 21.)  He does not say that DOC hired CJI to tell it which cases it should be concerned about.  Even in his own formulation, that decision had already been made by "DOC medical staff," and indeed the report and other *in camera* documents confirm that the selection of medical cases for review was made by DOC medical personnel and not by CJI.

The Court will now turn to Semple's deliberative process privilege, attorney-client privilege and work product claims.  In Section III, it will begin by setting forth the applicable legal principles.  In Section IV, it will apply those principles to the seventeen withheld documents.

## III.   APPLICABLE LEGAL PRINCIPLES

### A.     Choice of Law

Semple's privilege claims are governed by federal law.  Rule 501 of the Federal Rules of Evidence provides that "[t]he common law – as interpreted by United States courts in the light of reason and experience – governs a claim of privilege unless" the Constitution, a statute or a court rule provides otherwise.  Fed. R. Evid. 501.  The rule goes on to say that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision," *id.*, but a Section 1983 action is not such a case.  *See von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 141 (2d Cir. 1987) (in federal-question jurisdiction cases, "courts have consistently held that the asserted privileges are governed by principles of federal law"); *Rapkin v. Rocque*, 87 F.

Supp. 2d 140, 143 (D. Conn. 2000) (where a "case is before the Court based upon its federal question jurisdiction by virtue of Plaintiff's section 1983 claim . . . the elements of the attorney-client privilege are governed by federal law"), *see also* Fed. R. Evid. 501 advisory committee note ("In nondiversity jurisdiction civil cases, federal privilege law will generally apply.").  Because Imperati has invoked the Court's federal question jurisdiction (Am. Compl., ECF No. 59, ¶ 1), and because the parties evidently agree that federal law applies (*see generally* ECF Nos. 126, 136), the Court will apply federal law to Semple's privilege claims.

### B.   The Deliberative Process Privilege

The deliberative process privilege protects certain government documents from discovery in civil litigation.  The privilege is "a sub-species of work-product privilege that 'covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'"  *Tigue v. U.S. Dep't of Justice*, 312 F.3d 70, 76 (2d Cir. 2002) (quoting *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001)).

The privilege serves several purposes.  First and foremost, it is "designed to promote the quality of agency decisions by preserving and encouraging candid discussion between officials." *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005); *accord U.S. v. Nixon*, 418 U.S. 683, 705 (1974) (observing, in the context of claims of executive privilege, that "[h]uman experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process").  Second, the privilege "protect[s] against premature disclosure of proposed [agency] policies before they have been finally formulated or adopted." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *accord Grand Cent. P'ship,*

*Inc. v. Cuomo*, 166 F.3d 473, 481 (2d Cir. 1999). Third and relatedly, the privilege "protect[s] against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Providence J. Co. v. U.S. Dep't of Army*, 981 F.2d 552, 557 (1st Cir. 1992) (quoting *Coastal States*, 617 F.2d at 866)). As one court explained, "officials should be judged by what they decide, not for the matters they properly considered before making up their minds." *Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 482 F.2d 710, 718 (D. D.C. 1973), *rev'd on other grounds*, 421 U.S. 168 (1975).

To qualify for protection, an agency document must have three attributes. "In order for a document to be protected by deliberative process privilege, it must be (1) an inter-agency or intra-agency document; (2) 'predecisional'; and (3) deliberative." *Tigue*, 312 F.3d at 76-77 (citing *Klamath*, 532 U.S. at 8; *Local 3, Int'l Bhd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988); and *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979)); *accord Unidad Latina en Acción v. U.S. Dep't of Homeland Sec.*, 253 F.R.D. 44, 47-48 (D. Conn. 2008).

A document can meet the first requirement – that it be "an inter-agency or intra-agency document" – even if it is authored by an outside consultant. "When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of [the privilege]." *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980) (cited with approval in *Tigue*, 312 F.3d at 77-78). A document's status as an inter-agency or intra-agency document "depends not only on the intrinsic character of the document itself, but also on the role it played in the administrative process." *Lead Indus. Ass'n*, 610 F.2d at 80.

An agency document meets the second, "predecisional" requirement when "it was prepared in order to assist an agency decisionmaker in arriving at his or her decision." *Grand Cent. P'Ship*, 166 F.3d at 483. "Protected by this privilege are 'recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Tigue*, 312 F.3d at 80 (quoting *Grand Cent. P'Ship*, 166 F.3d at 482). Because the privilege protects documents that were prepared to help a decision-maker make her decision, it follows that "[t]o be pre-decisional, the communication . . . must have occurred before any final agency decision on the relevant matter." *Nat'l Sec. Archive v. C.I.A.*, 752 F.3d 460, 463 (D.C. Cir. 2014). Moreover, because few agency employees would "be inhibited from freely advising a decisionmaker for fear that his advice *if adopted,* will become public," "[a]n agency may be required to disclose a document otherwise entitled to protection . . . if the agency has chosen 'expressly to adopt or incorporate by reference [a] memorandum . . . in what would otherwise be a final opinion.'" *Nat'l Council of La Raza*, 411 F.3d at 356-57 (emphasis in original) (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 161 (1975)). Put differently, "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States*, 617 F.2d at 866.

Agency documents meet the third, "deliberative" requirement when they are "actually . . . related to the process by which policies are formulated." *Grand Cent. P'Ship*, 166 F.3d at 482 (quoting *Hopkins v. U.S. Dep't of Hous. & Urban Dev.*, 929 F.2d 81, 84 (2d Cir. 1991)). In determining whether a document is deliberative, courts have considered whether it "(i) formed an essential link in a specified consultative process, (ii) reflects the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely

17

disclose the views of the agency." *Grand Cent. P'ship*, 166 F.3d at 482 (quoting *Providence J. Co.*, 981 F.2d at 559) (internal quotation marks and brackets omitted). "In particular, it is well-settled that draft documents . . . are typically predecisional and deliberative" because they ordinarily "reflect only the tentative view of their authors; views that might be altered or rejected upon further deliberation either by their authors or by superiors." *MacNamara v. City of New York*, 249 F.R.D. 70, 78 (S.D.N.Y. 2008) (quoting *Exxon Corp. v. Dep't of Energy*, 585 F. Supp. 690, 698 (D. D.C. 1983)) (internal quotation marks and brackets omitted). In other words, "[d]rafts and comments on documents are quintessentially predecisional and deliberative." *Nat'l Council of La Raza v. Dep't of Justice*, 339 F. Supp. 2d 572, 583 (S.D.N.Y. 2004), *aff'd*, 411 F.3d 350.

Because the privilege developed principally to protect opinions and recommendations, it "does not . . . as a general matter, cover 'purely factual material.'" *Grand Cent. P'Ship*, 166 F.3d at 482 (quoting *Hopkins*, 929 F.2d at 85). As the U.S. Supreme Court has explained, "memoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context would generally be available for discovery." *E.P.A. v. Mink*, 410 U.S. 73, 87-88 (1973). Where an agency memorandum contains both factual and deliberative material, the "segregable factual portions of the document might still be subject to compelled disclosure." *Providence J. Co.*, 981 F.2d at 562 (cited with approval in *Grand Central*, 166 F.3d at 482). Yet the entire document may nevertheless retain its privileged character if it "is predominantly evaluative," and where "the limited factual material . . . is too intertwined with evaluative and policy discussions to require disclosure." *Tigue*, 312 F.3d at 82 (citing *Lead Indus. Ass'n*, 610 F.2d at 85).

The privilege protects documents relating to high-level agency policy formation, not to the agency's routine processes of self-evaluation or compliance monitoring. "The Privilege is

properly limited to communications relating to policy formulation at the higher levels of government; it does not operate indiscriminately to shield all decision-making by public officials." *Velez v. City of New York*, No. CV-2004-1775 (ENV/MDG), 2010 WL 2265443, at *4 (E.D.N.Y. June 2, 2010) (quoting *Scott v. Bd. of Educ.*, 219 F.R.D. 333, 337 (D. N.J. 2004)); *accord Grossman v. Schwarz*, 125 F.R.D. 376, 381 (S.D.N.Y. 1989). To claim the protection of the privilege, "the government must show that the material was prepared to assist the agency in the formulation of some specific decision . . . [and] 'not merely part of a routine and ongoing process of agency self-evaluation.'" *Tigue*, 312 F.3d at 80 (quoting *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1094 (9th Cir. 1997)). "[M]easuring compliance with existing procedures is not predecisional, and thus is not privileged." *Velez*, 2010 WL 2265443, at *3.

The distinction between policy formulation and routine compliance is illustrated by the case of *Tortorici v. Goord*, 216 F.R.D. 256 (S.D.N.Y. 2003). In *Tortorici*, prison officials conducted a "Quality Assurance Review" after an inmate committed suicide. *Id.* at 258. The plaintiff sought production of the review documents, but the officials withheld them on deliberative process privilege and other grounds, claiming that they informed a policy decision on "whether to medicate forcibly inmates at risk of suicide." *Id.* The officials conceded, however, that the review was also driven by a state regulation requiring "formal review" of inmate suicides. *Id.* The court held that the documents were not protected by the deliberative process privilege because, although they may have been considered in the course of making a policy decision, they were "not created for that purpose." *Id.* Instead, they were "created in order to measure compliance with existing procedures in the specific instance of [the inmate's] suicide." *Id.* "Therefore, while portions of the [documents] may arguably be 'deliberative,' they were not

prepared 'in order to assist an agency decisionmaker in arriving at his decision,' and as such are not 'predecisional.'" *Id.* (citing *Hopkins*, 929 F.2d at 81-84).

The deliberative process privilege is a qualified privilege, not an absolute one. *MacNamara*, 249 F.R.D. at 79; *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997). Thus, even when the government establishes that a given intra- or inter-agency document is predecisional and deliberative, courts nonetheless consider the "need to balance the public interest in nondisclosure against the need of the particular litigant for access to the privileged information." *McNamara*, 249 F.R.D. at 79 (quoting *U.S. v. U.S. Currency in the Sum of Twenty One Thousand Nine Hundred Dollars*, No. 98-CIV.-6168 (SJ), 1999 WL 993721, at *2 (E.D.N.Y. Sept. 21, 1999)). "In this balancing of competing interests, some of the factors that assume significance are: (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Mr. & Mrs. B. v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 35 F. Supp. 2d 224, 229 (E.D.N.Y. 1998) (citing *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979)) (internal quotation marks and ellipses omitted).

In balancing the interests in favor of or against disclosure, courts do not weigh the five factors equally. Rather, "[t]he first four factors . . . are weighed as a group against the fifth factor in determining whether the document should be produced." *Noel v. City of N.Y.*, 357 F. Supp. 3d 298, 304 (S.D.N.Y. 2019) ("*Noel II*"). The fifth factor weighs more heavily when the requesting party is seeking an agency document merely to "glean circumstantial evidence by examining deliberations and communications across wide areas of governmental functioning." *Id.* (citing *Noel v. City of N.Y.*, No. 15-CV-5236 (LTS/KHP), 2018 WL 6786238, at *5 (S.D.N.Y. Dec. 12,

2018)) ("*Noel I*").  Conversely, the fifth factor carries less weight when the discovery request is a "targeted inquir[y] focused on the motivation of decision makers in implementing or continuing the specific challenged policy."  *Noel II*, 357 F. Supp. 3d at 304 (citing *Noel I*, 2018 WL 6786238, at *5.)

The privilege also sometimes yields to the public interest in exposing government misconduct.  In addition to "the interest of litigants, and ultimately of society, in accurate judicial fact finding," "[t]here is . . .in some circumstances, a public interest in opening for scrutiny the government's decision making process."  *In re Franklin Nat'l Bank*, 478 F. Supp. at 582.  Thus, "where there is reason to believe the documents sought may shed light on government misconduct, the privilege is routinely denied, on the grounds that shielding internal government deliberations in this context does not serve the public's interest in honest, effective government."  *In re Sealed Case*, 121 F.3d at 738 (quoting *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 885 (1st Cir. 1995)) (internal quotation marks omitted).

It may seem paradoxical to base a privilege on the improvements in government decision-making that are said to come from official secrecy, while simultaneously basing an exception to that privilege on the need for public scrutiny of that decision-making.  *Cf. In re Franklin Nat'l Bank*, 478 F. Supp. at 582 (citing Justice Brennan's observation, in dissent in *Herbert v. Lando*, 441 U.S. 153, 195 (1979), that "a paradox inheres in the . . . rationale" underlying the executive privilege).  Some courts have resolved this seeming tension by holding that only "extreme" government wrongdoing can invoke the exception.  *E.g., Nat'l Whistleblower Ctr. v. Dep't of Health & Human Servs.*, 903 F. Supp. 2d 59, 68-69 (D. D.C. 2012) (finding no support for "the sort of 'extreme government wrongdoing' that would prevent Defendant from invoking the deliberative-process privilege here"); *ICM Registry, LLC v. U.S. Dep't of Commerce*, 538 F. Supp.

2d 130, 133 (D. D.C. 2008) (requiring a showing of "extreme" misconduct because "[i]f every hint of marginal misconduct sufficed to erase the privilege, the exception would swallow the rule").  In *ICM Registry*, the court held that the exception is limited to situations in which "the 'policy discussions' sought to be protected . . . were so out of bounds that merely discussing them was evidence of a serious breach of the responsibilities of representative government."  538 F. Supp. 2d at 133.  Other courts address the ostensible paradox by imposing upon "the party seeking discovery" the burden to "provide an adequate factual basis for believing that the requested discovery would shed light upon government misconduct."  *Tri-State Hosp. Supply Corp. v. U.S.*, 226 F.R.D. 118, 135 (D. D.C. 2005) (quoting *Chaplaincy of Full Gospel Churches v. Johnson,* 217 F.R.D. 250, 257 (D. D.C. 2003), *rev'd in part and vac'd in part on other grounds, In re England,* 375 F.3d 1169 (D.C. Cir. 2004)); *accord Judicial Watch of Fla., Inc. v. U.S. Dep't of Justice*, 102 F. Supp. 2d 6, 15 (D. D.C. 2000) ("There is no authority before the court . . . to support the proposition that the burden is on the government to prove a negative, i.e., to prove in the first instance that a document does *not* reveal any government misconduct.").

The deliberative process privilege is narrowly construed.  *See Nat'l Council of La Raza*, 411 F.3d at 355-56 (holding that the privilege, as encompassed by FOIA's "exemption 5," is "narrowly construed"); *Local 3, Int'l Bhd. of Elec. Workers*, 845 F.2d at 1180 (holding that FOIA's exemption 5 is "narrowly construed with all doubts resolved in favor of disclosure").  Moreover, the government bears the burden of proving every one of the privilege's elements.  *See MacNamara*, 249 F.R.D. at 79; *Mr. & Mrs. B*, 35 F. Supp. 3d at 231 (government "bears the burden of demonstrating that the privilege bars disclosure").  In these respects it is like the attorney-client privilege, *see In re Horowitz*, 482 F.2d 72, 81-82 (2d Cir. 1973), which the Court will discuss next.

### C.      The Attorney-Client Privilege

"The attorney-client privilege protects confidential communications between client and counsel made for the purpose of obtaining or providing legal assistance."  *In re Cty. of Erie*, 473 F.3d 413, 418 (2d Cir. 2007).   The privilege developed to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981).

The attorney-client privilege has three principal elements.  "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice."  *In re Cty. of Erie*, 473 F.3d at 419 (citing *U.S. v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996)).  "It is well settled that the burden of establishing the existence of . . . [the] privilege, in all of its elements, rests with the party asserting it."  *In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000) (brackets and quotation marks omitted).

The privilege may be claimed by governmental as well as non-governmental clients. *Brennan Ctr. for Justice at N.Y. Univ. Law Sch. v. U.S. Dep't of Justice*, 697 F.3d 184, 207 (2d Cir. 2012) ("The attorney-client privilege protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance."); *accord U.S. v. Jicarilla Apache Nation*, 564 U.S. 162, 169 (2011) ("The objectives of the attorney-client privilege apply to governmental clients.").  When a governmental client claims the protection of the attorney-client privilege, it bears the same burden and must make the same showing as a private client.  *See, e.g., Citizens Union of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 171 (S.D.N.Y. 2017) ("When the government asserts a claim of attorney-client

privilege, it must establish" the same three elements that a private litigant must establish); *Resolution Tr. Corp. v. Diamond*, 137 F.R.D. 634, 643 (S.D.N.Y. 1991) ("While government agencies may, under appropriate circumstances, invoke the attorney-client privilege with respect to confidential communications to and from their in-house or outside counsel just as private parties may, they must bear the same burden of establishing all of the elements of the privilege.").

Although they are not strictly "communication[s] between client and counsel," communications with an outside consultant can nevertheless be privileged when their purpose is to facilitate the lawyer's advice to the client. "Under certain circumstances . . . the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client." *U.S. v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995) ("*Adlman I*"). The Second Circuit has, "for instance, extended the application of the privilege to a communication between a client and an accountant, reasoning that accounting concepts are a foreign language to some lawyers . . . and therefore that the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer." *U.S. v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (discussing *U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961)). "Nevertheless, the extension has always been a cabined one," *id.*, and an accountant's or other consultant's communications do not become privileged merely because they later "prove important to an attorney's legal advice to a client." *U.S. v. Ackert*, 169 F.3d 136, 139 (2d Cir. 1999). "The touchstone of the inquiry" is whether the communication with the consultant was made in confidence for the purpose of obtaining legal advice from the lawyer, not for the purpose of obtaining the consultant's advice in his or her field. *Bloomingburg Jewish Educ. Ctr. v. Vill. of Bloomingburg*, 171 F. Supp. 3d 136, 141 (S.D.N.Y. 2016) (citing *Kovel*, 296

F.2d at 922); *see also In re Sampedro*, No. 3:18-mc-00047 (JBA/RMS), 2019 WL 157092, at *3 (D. Conn. Jan. 10, 2019).

The attorney-client privilege does not protect communications between non-lawyers merely because they concern topics on which a client has sought legal advice, as Semple evidently contends.  (*See* Hrg. Tr., ECF No. 121, at 33:23-34:5) (contending that "all communications pertaining to the CJI report are attorney/client privilege[d] even when the communication doesn't have an attorney on it anywhere," because "the report was commissioned at Attorney O'Neill's suggestion and request").  In *DeBeers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, for example, a corporation claimed that its communications with an outside management consultant were privileged, because they related to a topic on which it had also hired a law firm to "assess the . . . legal implications."  No. 04-Civ.-4099 (DLC), 2006 WL 357825, at *1-2 (S.D.N.Y. Feb. 15, 2006).  The court disagreed, because the fact that the corporation had sought legal advice "does not . . . result in the attorney-client privilege being extended to all communications between [the consultant] and [the corporation]."  *Id.* at *2.  "[T]he attorney-client privilege will cover communications between a party and a non-lawyer only when 'the communication is made so that the client may obtain *legal* advice *from the attorney*.'"  *Id.* at *2 (quoting *Haugh v. Schrader N. Am. Inc.*, No. 2-Civ.-7955, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003)) (brackets omitted).  "If what is sought is not legal advice . . . no privilege exists."  *Kovel*, 296 F.2d at 922.

### D.    The Work Product Doctrine

The work product doctrine shields from disclosure "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."  Fed. R. Civ. P. 26(b)(3).  Its principal purpose is to "shelter[] the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."  *U.S. v.*

*Nobles*, 422 U.S. 225, 238 (1975).  The doctrine also encourages diligence by "prevent[ing] one party from piggybacking on the adversary's preparation."  *Adlman I*, 68 F.3d at 1501; *accord Hickman v. Taylor*, 329 U.S. 495, 516 (1947) (Jackson, J., concurring) (the work product rule ensures that one side does not "perform its functions . . . on wits borrowed from the adversary").

"Three conditions must be met to earn work product protection."  *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, 240 F.R.D. 96, 105 (S.D.N.Y. 2007) (quoting *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97-Civ.-4978 (LMH), 2002 WL 31556382, at *4 (S.D.N.Y. Nov. 15, 2002)) (brackets omitted).  "The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative."  *Id.* As with the deliberative process privilege and the attorney-client privilege, a party invoking the work product doctrine "bears the burden of establishing its applicability to the case at hand."  *In re Grand Jury Subpoenas Dated Mar. 19, 2002 and Aug. 2, 2002*, 318 F.3d 379, 384 (2d Cir. 2003).  The first element – that the allegedly-protected material be "a document or a tangible thing" – is not in dispute here, but the second and third merit further discussion.

In this circuit, the second element is satisfied when the document in question is shown to have been "prepared or obtained *because of* the prospect of litigation."  *U.S. v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) ("*Adlman II*") (emphasis in original).  A document that is created because of a threat of litigation, and which analyzes that litigation, is protected by the work product doctrine even if it is also created and used for other business purposes.  *Id.* ("Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this formulation merely because it is created in order to assist with a business decision."); *Travelers Prop. & Cas. Co. of Am., LLC v. Daimler Trucks N. Am., LLC*, No. 14-cv-1889 (JPO/JLC), 2015 WL 1728682, at *2 (S.D.N.Y. Apr. 14, 2015) ("Courts in this Circuit

interpret Rule 26(b)(3) to afford work product protection to a document created because of the prospect of litigation, even if it was simultaneously created to assist with a business decision.") (quotation marks omitted).

On the other hand, a document is not considered to have been created "because of" litigation if it would have been created anyway in the ordinary course of business. "[I]t should be emphasized that the 'because of' formulation . . . withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation." *Adlman II*, 134 F.3d at 1202; *see also* Fed. R. Civ. P. 26(b)(3) advisory committee's notes to 1970 amendments ("Materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision."). "Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created 'because of' actual or impending litigation." *Adlman II*, 134 F.3d at 1202.[9]

The third element – that the document be "prepared by or for a party, or by his representative" – can, under the right circumstances, result in work product protection for documents created by a party's consultant. Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation . . . by or for another party or its representative (including the other party's attorney, consultant . . . or agent)."). The doctrine is "intensely practical" and "grounded in the realities of litigation in our

---

[9]     Semple concedes this point. (*See* ECF No. 86, at 15 (citing *Carpenter v. Churchville Greene Homeowner's Ass'n*, No. 09-CV-6552T, 2011 WL 4711961, at *8 (W.D.N.Y. Sept. 29, 2011) for the proposition that the proponent of work product immunity "must be able to show that a document was prepared (1) 'in anticipation of litigation' (2) by a party or its representative and (3) not in the ordinary course of business").).

adversary system." *Nobles*, 422 U.S. at 238.  And since "[o]ne of those realities is that attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial. . . . [i]t is therefore necessary that the doctrine protect material prepared by agents for the attorney as well as those prepared by the attorney himself." *Id.* at 238-39; *accord Costabile v. Westchester, N.Y.*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) ("The work product doctrine protects not only materials which are prepared by attorneys themselves, but also by their agents. . . . includ[ing] those who are enlisted by legal counsel to perform investigative or analytical tasks to aid counsel in preparing for litigation").

### E.    Waiver of Privilege

Even if all of the elements of a privilege are present, a party can waive protection by failing to assert its privilege claim in a timely manner.  Rule 34 requires that any objection to a document production request – including an objection based on privilege – be stated in writing within thirty days.  *See* Fed. R. Civ. P. 34(b)(2).  Moreover, the District of Connecticut's Local Rules require that any privilege objections be memorialized in a timely privilege log.  *See* D. Conn. L. Civ. R. 26(e).  When a party flouts both of these requirements, courts sometimes conclude that it has waived its privilege claims and must produce the requested documents.  *See, e.g., Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 238 F.R.D. 536, 538 (D. Conn. 2007).

Yet because privileges serve important values, courts are not quick to find that they have been waived by delay.  "[A] waiver of privilege objections is a more serious sanction than a waiver of other objections."  *Caudle v. Dist. of Col.*, 263 F.R.D. 29, 36 (D. D.C. 2009).  Principally for this reason, "a court's decision to consider a claim of attorney-client privilege waived should be done only after careful thought."  *Horace Mann*, 238 F.R.D. at 538; *see also Main St. Am. Assur. Co. v. Savalle*, No. 3:18-cv-02073 (JCH/SALM), 2019 WL 4437923, at *4-5 (D. Conn. Sept. 16,

2019) ("[T]he Court is generally reluctant to find claims of attorney-client privilege and work product protection waived.").

The Second Circuit has not established a bright-line test for determining when privileges have been waived by delay, but district courts in the circuit have typically considered three factors. The first is "the length of the delay" in asserting the privilege claim. *E.g., Am. Int'l Specialty Lines Ins. Co. v. Conn. Res. Recovery Auth.*, No. 3:06-cv-699 (AVC), 2012 WL 13018418, at *3 (D. Conn. Mar. 5, 2012); *Schiller v. City of N.Y.*, 245 F.R.D. 112, 118 (S.D.N.Y. 2007). The second factor is "the willfulness of the transgression." *Am. Int'l Specialty Lines*, 2012 WL 13018418, at *3; *accord AFP Imaging Corp. v. Philips Medizin Sys.*, No. 92-Civ.-6211 (LMM), 1993 WL 541194, at *3 (S.D.N.Y. Dec. 28, 1993) (considering the party's "willfulness or cavalier disregard for the rule's requirements"). And the third factor is the "harm to other parties" occasioned by the delay in asserting the claim. *Am. Int'l Specialty Lines*, 2012 WL 13018418, at *3. In applying these three factors, courts have added that "only flagrant violations of the discovery rules should result in a waiver of privilege." *E.g., id.* (quotation marks and brackets omitted); *accord Dey, L.P. v. Sepracor, Inc.*, No. 07-Civ.-2353 (JGK/RLE), 2010 WL 5094406, at *2 (S.D.N.Y. Dec. 8, 2010); *Essex Ins. Co. v. Interstate Fire & Safety Equip. Co., Inc.*, 263 F.R.D. 72, 76 (D. Conn. 2009).[10]

---

[10]    Applying these principles, the Court previously held that Semple had waived his privileges with respect to some document requests, but not others. (ECF No. 108, at 17) ("Balancing the three factors, the Court holds that Semple has waived his privileges with respect to the Second Set [of production requests] but not with respect to the Deposition Requests."). The seventeen *in camera* documents are among the latter group – in other words, they fall within a broad group of documents as to which the Court did not find a categorical waiver. Among the questions presented by the *in camera* review, however, are whether the waiver analysis should follow a different course or have a different result when the focus is not on the entire category, but rather on the seventeen individual documents.

In the case of the attorney-client privilege, a party can also waive protection by disclosing its communications to third parties. "[I]t is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence." *Mejia*, 655 U.S. at 134 (quoting *In re Horowitz*, 482 F.2d at 81-82). "A party that shares otherwise privileged communications with an outsider is deemed to waive the privilege by disabling itself from claiming that the communications were intended to be confidential." *Schaeffler v. U.S.*, 806 F.3d 34, 50 (2d Cir. 2015); *accord Certain Underwriters at Lloyd's v. Nat'l R.R. Passenger Corp.*, 162 F. Supp. 3d 145, 151 (E.D.N.Y. 2016) (insurers waived privilege by sharing lawyer's advice with third parties).

In determining whether a recipient of a governmental agency's attorney-client communications is a "third party" for privilege purposes, courts have applied a "need to know" test. "[T]he appropriate inquiry to determine whether the dissemination of privileged communications to . . . government employees [is] . . . did the recipient 'need to know' the content of the communication in order to perform his or her job effectively or to make informed decisions concerning, or affected by, the subject matter of the communication?" *Pritchard v. Cnty. of Erie*, No. 04-cv-00534C (SC), 2007 WL 1703832, at *4 (W.D.N.Y. June 12, 2007) (citing *Scholtisek v. Eldre Corp.*, 441 F. Supp. 2d 459, 464 (W.D.N.Y. 2006). "To the extent that the recipient of the information is a policymaker generally or is responsible for the specific subject matter at issue in a way that depends upon legal advice, then the communication is more likely privileged." *Scholtisek*, 441 F. Supp. 2d at 464.

In the passages that follow, the Court will not only consider whether Semple has established the elements of his deliberative process privilege, attorney-client privilege and work product claims. It will also consider whether he has waived his privileges by delay, and it will

consider Imperati's argument that he destroyed whatever privilege might have attached to his attorney-client communications by disseminating them to other DOC officials.

## IV.   APPLICATION OF THE FOREGOING PRINCIPLES TO THE *IN CAMERA* DOCUMENTS

According to Semple, the seventeen documents "can be placed into two groups." (ECF No. 126, at 7 n.3.) The first group includes three documents "which pertain to audits/reviews of inmate health care conducted by the Department of Correction." (*Id.*) The second group includes fourteen documents "which pertain to the CJI report as well as drafts of the CJI report." (*Id.*) As will be discussed below, the Court is unpersuaded that every item in the second group "pertain[s] to" the CJI Report. Nevertheless it will accept Semple's invitation to treat the seventeen documents as falling into two principal groups for purposes of evaluating his privilege claims.

### A.   The "Audit Plan" Documents

The first group contains three e-mails, two of which have attachments. Document 2997-99 is an e-mail from Dr. Maurer to three other DOC medical staff members, Dr. Craig Burns, Dr. Thomas Kocienda and Nurse Andrea Reischerl. (ECF No. 129, at 1.) Attached to the e-mail is a Microsoft Word file entitled "Audit Plan--April 19, 2016.docx." Document 3004-05 is a subsequent e-mail exchange between Drs. Burns and Maurer, in which Dr. Burns comments on the audit plan.[11] (*Id.* at 1-2.) Document 3006-08 is yet another link in the e-mail chain, to which Dr. Maurer attached a later version of the "Audit Plan" Word file. Semple claims that all of these documents are protected from discovery by the deliberative process privilege, and that Document

---

[11]   Although Semple's privilege log describes Document 3004-05 as having an attachment (ECF No. 129), it does not. Dr. Burns commented on the audit plan in the body of the e-mail, not in a separate attachment. Thus, there are three e-mails but only two "audit plan" attachments at issue.

3006-08 is protected by the attorney-client privilege as well.  (*Id.*)  He does not claim work product

protection for any of the three.

Semple has consistently described these documents as relating to DOC's procedures for

auditing CMHC's performance.  In his first privilege log, he described them as arising out of a

"[r]equest for review, input and advice regarding [a] draft audit plan."  (ECF No. 97-10, at 2.)  In

his second log, he elaborated that the documents were written "in response to [his] request . . . to

his top medical managers to put together a comprehensive audit plan addressing some of the issues

they have identified with Correctional Managed Health Care."  (ECF No. 129, at 1.)  In his brief,

he described the documents as "pertain[ing] to audits/reviews of inmate health care conducted by

the Department of Correction."  (ECF No. 126, at 7 n.3.)

Yet while Semple may have been consistent in his description of the documents, he has not

been completely accurate.  Having reviewed the documents *in camera*, the Court concludes that

they are not entirely or even principally about auditing.  To be sure, Dr. Maurer's first e-mail at

Bates number 2997, Dr. Burns' responsive e-mail at 3004, and the first third of the two "Audit

Plan" attachments do indeed "pertain to audits/reviews of inmate health care."  But in the

remaining two-thirds of the attachments, Dr. Maurer evidently went beyond her assignment and

proposed several "[o]ther interventions" that DOC could undertake with respect to the quality of

inmate health care delivered by CMHC.  The different parts of the documents yield different

deliberative process privilege analyses.

The audit-related portions of the documents are too routine to be protected by the

deliberative process privilege.  To claim the protection of the privilege, "the government must

show that the material was prepared to assist the agency in the formulation of some specific

decision . . . [and] 'not merely part of a routine and ongoing process of agency self-evaluation.'"

*Tigue*, 312 F.3d at 80 (quoting *Maricopa Audubon Soc'y*, 108 F.3d at 1094)).  Moreover, to invoke the privilege Semple must show that the documents concern "policy formulation at the higher levels of government" rather than "measuring compliance with existing procedures."  *Velez*, 2010 WL 2265443, at *3-4.  Yet an audit plan is, almost by definition, a process of self-evaluation in which an agency measures its compliance with its procedures.  *See, e.g., Audit,* WEBSTER'S NEW COLLEGIATE DICTIONARY (1980) (defining "audit" as "to examine with intent to verify"); *Audit,* BLACK'S LAW DICTIONARY (11th ed. 2019) ("audit" means "[a] formal examination of an individual's or organization's . . . compliance with some . . . set of standards").  And Semple's affidavit describes the audits as essentially routine.  (ECF No. 126-2, at 2-3 (stating that he would commission audits "from time to time" to evaluate whether "corrective actions and improvements" were needed).)  Because Semple has not met his burden under *Tigue* to show that the audit-related portions of the documents were "not merely part of a routine and ongoing process of agency self-evaluation," he may not withhold them under a claim of deliberative process privilege.  *E.g., Tortorici*, 216 F.R.D. at 258 (denying deliberative process privilege protection to documents "created in order to measure compliance with existing procedures").

The portions that concern "[o]ther interventions" are less obviously routine, and they appear to be predecisional and deliberative; nevertheless, the Court will order that they be produced because the balance of interests favors disclosure.  As Semple concedes, the deliberative process privilege "is not absolute," and even when an agency document is both predecisional and deliberative, the Court still must "balance the interests supporting and opposing the disclosure." (ECF No. 126, at 11.)  When conducting this balancing test, courts consider "(i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the

possibility of future timidity by government employees who will be forced to recognize that their secrets are violable." *Mr. & Mrs. B.*, 35 F. Supp. 2d at 229.  Balancing these factors favors disclosure of the portions of the documents that concern "[o]ther interventions."

To begin with, those portions are highly relevant to Imperati's claims.  They discuss "interventions" that could be undertaken to improve CMHC health care in April 2016 – two months before Nurse Oeser requested that the URC approve referring Bennett to an ENT – and they are therefore relevant to Imperati's claims about what Semple knew about the quality of inmate health care, when he knew it, and what he could have done about it in time to help Bennett. Furthermore, Semple has not shown that the information is reasonably available from "other evidence."  He says that Imperati had an opportunity to depose witnesses on the general topic of inmate health care, and to search the records of other cases for "determinations of inferior inmate medical care" (ECF No. 126, at 12), but he does not say that the specific information in the document is available through other sources.  Finally, while he asserts that disclosure would engender timidity in his subordinates (*id.* at 13), this claim is hard to square with his other statements about how free Imperati was to explore these topics in the subordinates' depositions. (*Id.* at 12) (arguing that the factors weigh against disclosure in part because Imperati was able to "inquire[] fully as to [DOC medical employees'] experiences, knowledge and opinions about the delivery of medical care" at their depositions).  So far as the record discloses, Semple did not object when Imperati deposed his subordinates about their opinions on CMHC's performance.  If their depositions did not raise the specter of "future timidity" arising out of a "recognition that their secrets are violable," *Mr. & Mrs. B.*, 35 F. Supp. 2d at 229, it is difficult to see how production of these documents will.  For these reasons, the Court overrules Semple's deliberative process privilege objections to production of Documents 2997-99, 3004-05 and 3006-08.

Unlike Documents 2997-99 and 3004-05, Semple contends that Document 3006-08 is protected by the attorney-client privilege.  (ECF No. 129, at 2.)  When the e-mail chain began with Document 2997-99 at 1:09 p.m. on April 19, 2016, it involved three doctors and a nurse.  By the time Document 3006-08 was written at 7:06 that evening, DOC attorney Nicole Anker had been added to the chain.  Semple says that Document 3006-08 includes a version of the audit plan "which incorporates the comments of" Attorney Anker and others, from whom Dr. Maurer "sought input on issues related to medical care provided by CMCH."  (ECF No. 126, at 8.)

Having reviewed the document, the Court concludes that Semple has not met his burden to show that it is protected by the attorney-client privilege.  Not all communications between an attorney and client are protected by the privilege; the party claiming protection must show that the communication was "made for the purpose of obtaining or providing *legal* assistance."  *In re Cty. of Erie*, 473 F.3d at 418 (emphasis added); *accord In re Signet Jewelers Ltd. Secs. Litig.*, 332 F.R.D. 131, 136 (S.D.N.Y. 2019) ("While it is true that Signet in-house counsel were copied on the e-mails . . . that does not make them privileged.").  "When an attorney is consulted in a capacity other than as a lawyer, as (for example) a policy advisor, media expert, business consultant, banker, referee or friend, that consultation is not privileged."  *In re Cty. of Erie*, 473 F.3d at 421 (citing *In re Lindsey*, 148 F.3d 1100, 1106 (2d Cir. 1998)).  The Court has compared the "Audit Plan" Word file included in Document 3006-08 to the one included Document 2997-99, and even if Attorney Anker had been responsible for all of the changes between the two documents, there is no discernable legal advice in them.  *Id.* at 419 ("Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct. . . . It requires a lawyer to rely on legal education and experience to inform judgment.").

In summary, Semple has failed to carry his burden to prove that the three documents are protected by the deliberative process privilege, and he has also failed to show that Document 3006-08 is protected by the attorney-client privilege.  The Court will therefore order him to produce Documents 2997-99, 3004-05 and 3006-08.

B.      **The CJI Report and Other Documents**

Semple contends that the remaining fourteen documents are all either drafts of the CJI Report or other documents that "pertain to the CJI report."  (ECF No. 126, at 7 n.3.)  The Court will break them into two sub-groups for purposes of discussing Semple's privilege claims: (1) documents that are, or contain, drafts or copies of the CJI Report itself; and (2) documents that, in Semple's view, "pertain to" the report.

1.      *The CJI Report*

The first subgroup includes five documents.  Document 4024-80 is an e-mail chain transmitting December 2016 and February 2017 draft reports from CJI.  Documents 4132-81, 4182-4259 and  4260-4309 are e-mail chains to which the March 9, 2017 draft was attached.  And Document 4361-4430 is an e-mail transmitting the March 15, 2017 draft, along with the MOA Analysis.  Semple claims that all of these documents are protected from discovery by the deliberative process privilege, the attorney-client privilege and the work product doctrine.  (ECF No. 129.)  The Court will examine each privilege claim in turn.

a.      *Deliberative process privilege*

Having reviewed the drafts of the report and the claims that Semple made about them in his brief, the Court concludes that he has not sustained his deliberative process privilege claim. To begin with, he has not demonstrated that the CJI Report is a "pre-decisional" agency document. "To be pre-decisional, the communication . . . must have occurred before any final agency decision

36

on the relevant matter." *Nat'l Sec. Archive*, 752 F.3d at 463.  When the Court asked him to
carefully identify the agency decision to which the CJI Report related, so that it could determine
whether the report pre- or post-dated that decision, Semple responded that "[t]he 'decision' made
here was the identification of inmate medical cases that in the opinion of the DOC medical staff,
were concerning."  (ECF No. 126, at 21.)  Yet if that was indeed the decision, the CJI Report post-
dated it, because the medical cases had already been identified by the time of the report.
Documents 3961-65 and 3980-81 confirm that the identification process was essentially complete
by May 2016, months before the first draft of the CJI Report was written.  As Imperati correctly
notes, "if the decision is limited to the identification of inmate medical cases by DOC medical
staff, that was completed on or about May 26, 2016 . . . . This alone would make the CJI Report
post-decisional, since . . .  the first draft of the CJI Report [is dated] on February 8, 2017."  (ECF
No. 136, at 37.)

Moreover, even if the CJI Report had been pre-decisional and entirely deliberative,[12] the
privilege still would not protect it because the balance of interests would favor disclosure.  *See Mr.
& Mrs. B.*, 35 F. Supp. 2d at 229 (listing factors typically considered by courts when conducting a
balance-of-interests analysis).  The first factor in the balance-of-interests analysis – "the relevance
of the evidence sought to be protected" (*id.*) – clearly weighs in favor of disclosure here.  The CJI
Report is highly relevant to Imperati's claims about the quality of the health care delivered by
CMHC during the months when Bennett's cancer allegedly went undiagnosed, and about the role
of the DOC-CMHC MOA in inmate health outcomes.  The second factor also supports disclosure,

---

[12]     The report contains factual information that is segregable from the deliberative material,
and accordingly it is not entirely deliberative.  *Grand Cent. P'Ship*, 166 F.3d at 482 ("Purely
factual material" does not "reflect[] the agency's deliberative process" and therefore "is not
protected.") (quoting *Local 3, Int'l Bhd. of Elec. Workers*, 845 F.2d at 1180).

because Semple has not plausibly explained how the information in the report is reasonably available from other evidence.  He notes that Imperati deposed him and his subordinates about their "experiences, knowledge and opinions about inmate health care," but he concedes that when the questioning turned to the report, those questions were "met with objections by counsel each time."  (ECF No. 126, at 24-25.)  The third and fourth factors likewise weigh in favor of disclosure, because this litigation is incontrovertibly serious, and allegations of government misconduct are at the very heart of the case.  *See, e.g., Noel II*, 357 F. Supp. 3d at 304 (third and fourth factors support discovery when complaint raises "irrefutably serious" issues and the government's "decisionmaking clearly is the central issue").

The fifth factor – the "possibility of future timidity by government employees" – can outweigh the other four in an appropriate case, but this is not such a case.  As previously noted, "[t]he first four factors . . . are weighed as a group against the fifth factor in determining whether the document should be produced."  *Id.*  In applying the fifth factor, courts consider whether the party seeking the document is trying to "glean circumstantial evidence by examining deliberations and communications across wide areas of governmental functioning," or whether instead she is making "targeted inquiries focused on the motivation of decision makers in implementing or continuing the specific challenged policy."  *Id.* (citing *Noel I*, 2018 WL 6786238, at *5).  The wider the inquiry, the "greater [the] prospects of impeding the . . . government's ability to promote the quality of agency decisions through the encouragement of candid discussion between officials."  *Id.* (quoting *Noel I*, 2018 WL 6786238, at *5) (quotation marks and brackets omitted).

In seeking documents within Semple's control "demonstrating that medical care given to inmates . . . has fallen below the statutory or constitutional standard of care" (Req. No. 24, ECF No. 77-8, at 9), Imperati has made a reasonably targeted inquiry into a relatively narrow area of

governmental functioning.  She has asked for documents within the control of one person, evidencing one agency's non-compliance with a particular standard.  In *Noel II*, the plaintiff requested that America's largest city produce documents concerning its compliance with a fair housing rule; although the request "involved multiple agencies," the court held that the request was not so broad as to cause the fifth factor to outweigh the first four.  *Noel II*, 357 F. Supp. 3d at 304, 308 ("calibrat[ing] . . . the first four factors against the fifth factor, the Court finds that the balance, though a close call, weighs in favor of disclosure").  Imperati's request is more relevant, more targeted, and narrower than the successful request in *Noel II*.

Furthermore, Semple's claims about "future timidity" are supported only by generic and conclusory claims.  He abstractly asks whether a DOC employee would be "eager to provide his agency head with his opinion . . . if that employee knew that his assessment would be subject to public disclosure" (ECF No. 126, at 25-26), but that could be said about almost any government document.  Semple does not explain how the disclosure of this specific document – a report by a consultant who was evidently hired only once, given to a Commissioner who has since retired, about a health care provider that the DOC terminated over two years ago – would be so chilling to future agency candor as to outweigh the other four factors.  In short, he has not sustained his deliberative process privilege claim.

### b.  *Work product protection*

Semple also claims that the CJI Report is protected from discovery by the work product doctrine.  (ECF Nos. 97-11, 115.)  As explained above, this claim not only raises the question of whether the report was commissioned in contemplation of litigation, but also whether it "would have been created in essentially similar form irrespective of litigation."  *Adlman II*, 134 F.3d at 1202.  "If the district court concludes that substantially the same Memorandum would have been

prepared in any event . . . then the court should conclude that the Memorandum was not prepared because of the expected litigation and should . . . deny[] the protection of the [work product] Rule." *Id.* at 1204.  As with all other elements of his privilege claims, Semple bears the burden on this point.  *See Allied Irish Banks*, 240. F.R.D. at 105; *Stephenson Equity Co. v. Credit Bancorp., Ltd.*, No. 99-Civ.-11395 (RWS), 2002 WL 59418, at *3 (S.D.N.Y. Jan. 16, 2002) (proponent of work product protection bore burden to "provide[] evidence that supports a finding that these documents were prepared outside the ordinary course of business in preparation for litigation").

The *Allied Irish Banks* case illustrates this principle.  Upon discovering a "rogue trading scheme perpetrated by one of its traders," Allied Irish Banks ("AIB") retained a consultant to investigate the wrongdoing and report to its Board of Directors.  240 F.R.D. at 99-100.  It released the consultant's report to the public, and when it later sued Bank of America, that bank sought production of documents created during the preparation of the report.  *Id.* at 99.  AIB objected on attorney-client privilege and work product grounds, but the court ordered disclosure.  *Id.* at 109.  While there was "no doubt that as soon as AIB learned of [the trader's] illegal activities, it believed that litigation would result," this observation was insufficient to trigger work product protection.  *Id.* at 106.  "The question under *Adlman* . . . is not merely whether AIB contemplated litigation when it generated the materials at issue, but rather whether these materials 'would have been prepared in essentially similar form irrespective of litigation.'"  *Id.* (quoting *Adlman II*, 134 F.3d at 1204).  AIB acknowledged that it commissioned the report in part to reassure its stakeholders – in other words, for the "business-related purpose[]" of "address[ing] the concerns of [its] customers, shareholders, creditors, and the media."  *Id.*  These and other "circumstances surrounding the creation of the Report point[ed] to the ineluctable conclusion that AIB would have prepared the Report, along with the materials used to generate it, simply because of its 'business-

related purposes' – that is, regardless of the potential for litigation."  *Id.* at 107; *accord De Beers LV Trademark Ltd.*, 2006 WL 357825, at *1 ("[T]he documents at issue here are *business strategy* documents that Bain would have created for DBG in similar form even if the potential for litigation had been remote.").

In this case, Semple has failed to show that the CJI Report would not have been produced in essentially the same form for other, non-litigation purposes.  In particular, he has failed to show that the report would not have been created in substantially the same form as part of his effort to "reimagin[e] and rebuild[]" correctional health care.  In his privilege logs, Semple twice identified that effort as the "general subject" of the report.  (ECF No. 97-11, 102-1.)  When asked at a hearing "why . . . these documents [are] protected by the work product doctrine," his counsel responded that "the Attorney General's Office and the Department of Correction worked together to try to come up with identifying issues in the current health care system and try to reimagine and rebuild a new health care system."  (Hrg. Tr., ECF No. 121, at 34:24 – 35:6.)  Moreover, his affidavit does not disclaim "reimaging and rebuilding" correctional health care as the reason why the report was commissioned.  (*See* ECF No. 126-2, ¶ 4 ("The purpose of the [CJI] contract was to provide information to Attorney O'Neill so that he could provide legal advice to me and to the agency regarding inmate health care.").)

*In camera* review of the CJI Report does not dispel the impression that it would have been prepared in substantially the same form in the absence of actual or anticipated litigation.  The Court cannot identify a single paragraph that would not interest an attorney who had been tasked with advising a DOC Commissioner on "reimagining and rebuilding" correctional health care, or on those structural aspects of the DOC-CMHC relationship that had arguably led to bad inmate health outcomes.  By contrast, there are long passages in the document that have no discernable relation

to actual or threatened litigation, and indeed the document scarcely references litigation at all. Having read all five versions in their entirety, the Court is left with a strong sense "that substantially the same Memorandum would have been prepared in any event," and that the report is therefore undeserving of "the protection of the [work product] Rule." *Adlman II*, 134 F.3d at 1204. At any rate, Semple has failed to show the converse – that the report "would not have been prepared in substantially similar form but for the prospect of . . . litigation," *id.* at 1195 – and his work product objections are accordingly overruled.

### c.  *Attorney-client privilege*

The attorney-client privilege differs from the work product doctrine in several respects. Whereas the work product doctrine protects documents "created because of anticipated litigation," and does not protect documents that "would have been created in essentially similar form irrespective of the litigation," *Adlman II*, 134 F.3d at 1195, 1202, the attorney-client privilege does not hinge on the existence or threat of a lawsuit. It protects confidential communications between counsel and client, made for the purpose of obtaining or providing legal advice, even if that legal advice concerns topics other than actual or anticipated litigation. *See In re Cty. of Erie*, 473 F.3d at 419 ("because of litigation" not a required element of the attorney-client privilege).

Although consultant reports like the CJI Report are not strictly "communications between counsel and client," the attorney-client privilege can nevertheless protect them when their purpose "is to assist the attorney in rendering advice to the client." *Adlman I*, 68 F.3d at 1499. "The privilege may be extended when it is the lawyer himself who 'needs outside help' to convey legal advice." *Bloomingburg Jewish Educ. Ctr.*, 171 F. Supp. 3d at 141 (quoting *In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321, 326 (S.D.N.Y. 2003)). The privilege can, for example, protect an accountant's report that "enable[s] the attorney to understand the client's

financial information in order to provide legal advice."  *Id.* (citing *Kovel*, 296 F.2d at 922); *accord Exp.-Imp. Bank v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005) ("[C]ommunications with a financial advisor are covered by the attorney-client privilege if the financial advisor's role is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer.").  It can also protect a "non-lawyer consultant's advice" when that advice is "necessary, or at least highly useful for the effective consultation between the client and the lawyer which the privilege is designed to permit."  *In re Sampedro*, 2019 WL 157092, at *3 (quoting *Kovel*, 296 F.2d at 922).

Semple has shown that the CJI Report was "necessary, or at least highly useful for . . . effective consultation" between himself and AAG O'Neill, and by extension he has shown that it is encompassed by the attorney-client privilege.  He has come forward with sworn testimony from AAG O'Neill, stating that "the purpose of the contract with CJI was to provide raw data regarding patient care in 25 representative [cases] . . . and have CJI's team compile the data . . . into an explanation that I could understand and discuss with the Commissioner."  (ECF No. 126-4, at 45:23-46:3.)  AAG O'Neill explained that he is not "a medical expert" (*id.* at 46:25-47:1), and that he needed an "explanation" from such an expert[13] "so that [he] could advise the Commissioner of Correction on which, if anything, he had to do to address patient health care."  (*Id.* at 46:1-7.)  He elaborated that he "needed to hire an expert who could advise [him] on what salient facts need to be looked at in certain medical charts and to make certain medical recommendations about those charts so that [he] could then meet with the Commissioner of Correction and discuss those with him."  (*Id.* at 52:23-53:2; *accord* ECF No. 126-2, ¶ 4 (Semple's own affidavit stating that "[t]he

---

[13]     Although CJI is a correctional consulting firm, the CJI Report was authored by a doctor. (ECF No. 126-4, at 53:5-8 (FOI Commission testimony of AAG T. O'Neill that "a doctor did write this report").)

purpose of this contract was to provide information to Attorney O'Neill so that he could provide legal advice to me and the agency regarding inmate health care").)  In submitting this testimony, Semple has shown that the CJI Report was an instance of a lawyer "need[ing] outside help" from a non-lawyer consultant  "to convey legal advice." *Bloomingburg Jewish Educ. Ctr.*, 171 F. Supp. 3d at 141 (quotation marks omitted); *see also Kovner v. Comm'r*, No. FIC 2017-0310, ECF No. 126-5, at 4 (Conn. Freedom of Info. Comm'n Dec. 13, 2017) (ruling on *in camera* review of CJI Report, characterizing it as "a medical expert's evaluation of medical data . . . . giv[en] . . . to the lawyer to enable counsel to give sound and informed advice").

Of course, Semple did not submit this testimony – or otherwise demonstrate that the report was attorney-client privileged – until long after his objections to Request No. 24 were due.  This raises the question of whether he waived an otherwise-valid privilege claim through delay.  As noted in Section III above, courts typically consider three factors when analyzing this question: "the length of the delay" in asserting the privilege claim, "the willfulness of the transgression," and the "harm to other parties."  *E.g., Am. Int'l Specialty Lines*, 2012 WL 13018418, at *3.  This Court previously applied these factors to the Deposition Requests as a group, and it concluded that Semple had not categorically waived his privileges.  (ECF No. 108, at 13-17.)  The question now before the Court is whether the application of these factors to the specific case of the CJI Report yields a different result.

The Court concludes that it does not.  While the first factor might favor Imperati in a technical sense – recall that Semple delayed more than six months in logging the CJI Report on a privilege log – Imperati has known since the very beginning of this lawsuit that Semple claimed privilege with respect to the report.  (Init. Compl., ECF No. 1, ¶ 208 (alleging that Semple "hid the [report] behind the attorney-client privilege").)  And while Semple may have been more willfully

44

non-compliant with the discovery rules in the specific case of the CJI Report than he was with the

Deposition Requests generally,[14] Imperati cannot claim to have been harmed by his assertion of

privilege.  This is not a case in which the plaintiff was counting on receiving a document in time

to use it in opposition to summary judgment or at trial, only to be surprised by an eleventh-hour

privilege claim.  Here, Imperati specifically pled her complaint around the absence of the CJI

Report (ECF No. 59, ¶ 179), and she therefore cannot claim to be prejudiced by its non-production.

Balancing the three factors, the Court concludes that Semple's delay did not waive his privilege

claims with respect to the CJI Report.

Imperati argues that Semple waived privilege by disclosing the CJI Report to other

correctional officials (*e.g.*, ECF No. 136, at 28), but the Court disagrees.  *In camera* review reveals

that the CJI Report was disclosed to the following persons, other than Semple and AAG O'Neill:

Attorney Anker; Correctional Health Services Program Director Jennifer Benjamin; Nurse

Bombard; DOC Deputy Commissioner Cheryl Cepelak; Correctional Health Services Program

Director Colleen Gallagher; Dr. Maurer; and Deputy DOC Commissioner Monica Rinaldi.[15]  The

---

[14]    In its earlier ruling, the Court observed that Semple's "counsel's conduct with respect to the Deposition Requests" was "more negligent than willful."  (ECF No. 108, at 15.)  The Court is less willing to say this about counsel's handling of the CJI Report.  When counsel finally got around to logging the CJI Report, she did not identify it as such.  (*See* ECF No. 97-11, at 8 (describing Document 4024-80 as a communication from Cheryl Cepelak to Dr. Maurer concerning an "independent consultant . . . review," without disclosing that the consultant was CJI or that the communication included a draft of CJI's report).)  Moreover, the basis for her privilege claim has shifted over time.  (*Compare id.* (CJI hired to "assist[] . . . in the reimagining and rebuilding of medical services within the DOC;" its report helped "make policy decisions") *with* ECF No. 126, at 31 (asserting that "the report would not have been prepared except for the litigation concerns of the AAG, and the Commissioner's request for legal advice to the AAG in light of these litigation concerns").)  These actions strike the Court as more willful than the instances of simple negligence described in its prior ruling.

[15]    The CJI Report was also transmitted to four administrative assistants:  Judene Beausoleil, Kate Cahill, Patricia Davis and Heather Rivino.  The Court declines to hold that a client waives privilege by sending an attorney-client communication to his secretary for printing or for other administrative reasons.

Court is satisfied that each of these individuals had a "need to know" the contents of the CJI Report, inasmuch as each one "is a policymaker generally or is responsible for the specific subject matter at issue in a way that depends upon legal advice." *Scholtisek*, 441 F. Supp. 2d at 464. In summary, Semple has carried his burden to show that the CJI Report is protected by the attorney-client privilege, and he has not waived that protection by delay or by disclosing the document to persons who are "third parties" for privilege purposes.

The same cannot be said, however, of the MOA Analysis. As previously noted, Document 4361-4430 is actually two documents: the CJI Report and its covering e-mail are at Bates pages 4382-4430, and the MOA Analysis and its covering e-mail are at pages 4361-4381. In contrast to the CJI Report, Semple has done nothing to support his privilege claims with respect to the MOA Analysis. He has not, for example, come forward with testimony from AAG O'Neil demonstrating that the MOA Analysis was "necessary, or at least highly useful, for the effective consultation between the client and the lawyer," as he did with the CJI Report. *Mejia*, 655 F.3d at 132 (quoting *Kovel*, 296 F.2d at 922). The Court will order him to produce it.[16]

### 2. Documents that Semple Characterizes as "Pertaining to" the CJI Report

Semple has withheld ten other documents under claims of privilege, in addition to the "Audit Plan" documents and the copies of the CJI Report discussed above. He asserts that the ten documents are categorically privileged because they "pertain to the CJI Report." (ECF No. 126, at 7 n.3.) As previously noted, however, a document does not become privileged merely because it "pertains to" a subject on which a client sought legal advice. *See, e.g., DeBeers LV Trademark Ltd.*, 2006 WL 357825, at *1-2 (observing that "the fact that the corporation had sought legal

---

[16]     Some passages of the MOA Analysis recap conclusions of the CJI Report. Semple may redact those few passages.

advice "does not . . . result in the attorney-client privilege being extended to all communications between [the consultant] and [the corporation]").  Moreover, *in camera* review reveals that not all ten documents pertain to the CJI Report.  The Court therefore rejects any argument that the ten documents are categorically privileged, and it will analyze them individually.

### a.    Document 3980-81

Document 3980-81 is an e-mail from Nurse Bombard to Dr. Maurer, dated May 26, 2016. In the e-mail, Nurse Bombard "provided a list of twenty inmate medical cases for independent review."  (ECF No. 129, at 4.)  Semple contends that the e-mail is protected by the deliberative process privilege.  (*Id.*)  As with the CJI Report itself, he identifies the decision being deliberated in this document as "the identification of inmate medical cases that in the opinion of the DOC medical staff, were concerning."  (ECF No. 126, at 21.)

The Court concludes that Document 3980-81 is not protected from discovery by the deliberative process privilege.  The text of the e-mail suggests that the "identification of inmate medical cases" had already been made, and consequently Semple has not shown that the document was "pre-decisional" in relation to the decision under deliberation.  Moreover, the balance of interests favors disclosure of the e-mail, for the same reasons cited in Section IV.B.1.a above.  The Court will therefore order Semple to produce it.[17]

### b.    Document 4021-23

Document 4021-23 is another e-mail from Nurse Bombard to Dr. Maurer, containing "eight additional inmate medical cases for possible review."  (ECF No. 129, at 4-5.)  Semple claims that

---

[17]    Although Semple has not objected to production of Document 3980-81 on medical privacy grounds (ECF No. 129, at 4), the Court will nevertheless permit him to redact inmate names and numbers from this document and any other document that he will be producing, provided that he replaces them with a unique identifier.  (*See* discussion, ECF No. 85, at 3 (prior court order discussing protocol for redacting private medical information).)

it is protected by the deliberative process privilege, but the Court disagrees.  Semple has not met

his burden to demonstrate that the e-mail is "pre-decisional" in relation to the decision assertedly

under consideration, and in any event the balance of interests would favor disclosure.  The Court

will order him to produce it.

### c.       Document 4310

Document 4310 is an April 2017 e-mail chain principally between Dr. Maurer and  Deputy

Commissioner Cepelak.   By April 2017, DOC had received the final draft of the CJI Report (*see*

ECF No. 129, at 13 (reflecting receipt date of March 15, 2017)), and its attention had turned to

"address[ing] the medical issues generated by the twenty-five case review" and "request[ing]

corrective measures" from CMHC.  (ECF No. 129, at 7-8.)  The e-mail chain discussed using a

particular form – a so-called "ISBAR"[18] – as a vehicle for requesting those corrective measures.

Semple claims that the e-mail chain is protected by the deliberative process privilege (ECF

No. 129, at 7-8), but the Court disagrees.  The document post-dates the decision that Semple says

was under consideration, and its subject matter – whether to use a particular form to transmit

concerns to CMHC – is too pedestrian to support his privilege claim.  *Cf. Velez*, 2010 WL 2265443

at *4 ("The [deliberative process privilege] is properly limited to communications relating to

policy formulation at the higher levels of government; it does not operate indiscriminately to shield

all decision-making by public officials.").  Semple also claims that the e-mail chain is attorney-

client privileged (ECF No. 129, at 7-8), but it contains no "communication[s] between client and

counsel" nor any indication that it "was made for the purpose of obtaining or providing legal

advice."  *In re Cty. of Erie*, 473 F.3d at 419.  His privilege objections are overruled.

---

[18]       An "ISBAR" form is a DOC form with five principal sections:  Introduction, Situation,
Background, Assessment, and Recommendation/Request.  (ECF No. 136-10.)

### d.      Document 4313-14

Document 4313-14 is an e-mail chain that began with an April 3, 2017 e-mail from Dr. Maurer to AAG O'Neill.  "In it, Dr. Maurer identifies key elements of her concerns regarding the case reviews" (ECF No. 129, at 8-9), and she requests further legal advice from AAG O'Neill. Having reviewed the document *in camera*, the Court concludes that it is protected from discovery by the attorney-client privilege.

Imperati does not dispute that the initial link in the e-mail chain was privileged in the first instance, but she argues that the privilege was destroyed by the second and third links.  (ECF No. 136, at 31.)  In those links, Dr. Maurer forwarded her e-mail to other high-level DOC officials, including Human Resource Director Jeffrey Miller and Deputy Warden Karen Martucci.  (ECF No. 129, at 9.)  The Court declines to hold that she waived the privilege when she did so, for the reasons discussed in Section IV.B.1.c above.  Semple's attorney-client privilege objection to the production of Document 4313-14 is sustained.

### e.      Document 4326-27

Document 4326-27 is another e-mail chain concerning the use of the "ISBAR" form for requesting corrective measures from CMHC.  It is not protected by the deliberative process privilege, for the same reasons that Document 4310 was not.  But Document 4326-27 differs from Document 4310 in that it included requests for legal advice from DOC Attorney Nicole Anker, and referenced requests for legal advice from AAG O'Neill.  The Court sustains Semple's attorney-client privilege objection to the production of Document 4326-27.

### f.      Documents 4328-29, 4335-43 and 4344-60

Documents 4328-29, 4335-43 and 4344-60 can be treated together.  All three are e-mail chains that began with a July 20, 2017 e-mail from Nurse Bombard to Dr. Maurer, with a copy to

Deputy Commissioner Cepelak.  In Document 4335-43, the second link in the e-mail chain is a follow-up e-mail from Nurse Bombard to Dr. Maurer dated July 25, 2017.  In Document 4328-29, the second link is a follow-up e-mail sent on August 10, 2017. Document 4344-60 has several additional links, the last of which was written on December 13, 2017.  Documents 4335-43 and 4344-60 include attachments, but Document 4328-29 does not.

Semple claims that these documents are protected by the deliberative process privilege, but the Court disagrees.  The three documents all post-date the final draft of the CJI Report, and they are therefore post-decisional with respect to the decision said to be under consideration.  They do not discuss any matters of high agency policy, nor do they suggest that any significant policy decisions were under consideration.  The documents contain Nurse Bombard's observations about the quality of care delivered to specific inmates, and thus relate more to "measuring compliance with existing procedures" than to any contemplated policy decision.  *See Velez*, 2010 WL 2265443, at *3.  Semple has not met his burden to show that the three documents were "prepared to assist the agency in the formulation of some specific decision . . . [and] not merely part of a routine and ongoing process of agency self-evaluation."  *Tigue*, 312 F.3d at 80 (internal quotation marks omitted).

Moreover, in the case of Documents 4335-43 and 4344-60, the balance of interests weighs particularly heavily in favor of disclosure.  As noted, one of the factors in the balance-of-interests analysis is the "relevance of the evidence sought to be protected."  *Mr. & Mrs. B.*, 35 F. Supp. 2d at 229.  Bennett is among the inmates whose case is discussed in the attachments to Documents 4335-43 and 4344-60, and those documents are therefore particularly relevant to Imperati's claims.

Semple also contends that these three documents are protected by the attorney-client privilege and the work product doctrine, but here too, the Court disagrees.  The documents are not

protected by the attorney-client privilege because they are not "communication[s] between client and counsel," and there is no evidence that they were "made for the purpose of obtaining or providing legal advice."[19]  *In re Cty. of Erie*, 473 F.3d at 419.  Moreover, there is no suggestion that they were written to assist an attorney-client consultation, let alone that they were "necessary, or at least highly useful, for the effective consultation between the client and the lawyer."  *Mejia*, 655 F.3d at 132.  And Semple's work product claim fails because he has not shown – as he acknowledges he must – that the documents were prepared "in anticipation of litigation" and "not in the ordinary course of business."  (ECF No. 86, at 15 (citing *Carpenter*, 2011 WL 4711961, at *8).)  The documents contain no indication that they were prepared because of litigation, and every indication that they were prepared in the ordinary course of Nurse Bombard's job duties.  Semple's objections to production of Documents 4328-29 and 4335-43 are overruled.

### g.  *Document 3961-65*

Document 3961-65 is a five-link e-mail chain.  (ECF No. 129, at 2-4.)  The first four links are exchanges in which Attorney Anker provides advice to Dr. Maurer, and Dr. Maurer questions that advice.  Nurse Bombard was copied on all four links, and in the fifth link he responded to Dr. Maurer but not to Attorney Anker.  Imperati appears to concede that the first four links were attorney-client privileged in the first instance, but she argues that "the entire email chain sheds attorney client privilege as the last email in time does not copy counsel."  (ECF No. 136, at 27.)  The Court disagrees that Nurse Bombard destroyed the privilege, and it sustains Semple's attorney-client privilege objections to the first four links of the chain.

---

[19]     Attorney Anker was copied on two links of the six-link chain in Document 4344-60, but that alone does not make the e-mails privileged.  *In re Signet Jewelers Ltd. Secs. Litig.*, 332 F.R.D. at 136 ("While it is true that Signet in-house counsel were copied on the e-mails . . . that does not make them privileged.").

Semple does not claim that the fifth link is attorney-client privileged, inasmuch as it is not an attorney-client communication, but he does claim that it is protected by the deliberative process privilege.  The issues discussed in the fifth link are too pedestrian to merit protection by that privilege, however, and accordingly the Court overrules Semple's objection.  Semple may redact the first four links in the e-mail chain, but the Court will direct him to produce the fifth.

## V.   CONCLUSION AND ORDER

For the foregoing reasons, the Court overrules all of Semple's objections to the production of – and grants Imperati's motion for an order compelling the production of – the documents bearing the following Bates numbers:  2997-99, 3004-05, 3006-08, 3980-81, 4021-23, 4310, 4328-29, 4335-43, 4344-60 and 4361-81.  Semple's objections are also overruled, and Imperati's motion is also granted, with respect to that portion of Document 3961-65 containing the May 19, 2016 e-mail from Nurse Bombard to Dr. Maurer.  Semple may redact the names and numbers of inmates other than Bennett from any document he produces, provided that he replaces them with a unique identifier.  Semple may also redact those few passages of the MOA Analysis – that is, Document 4361-81 – that would disclose the conclusions of the CJI Report.

In light of Imperati's approaching deadline for responding to Semple's summary judgment motion, and the fact that Semple has already assembled and Bates-stamped the documents, the Court exercises its discretion under Local Rule 37(d) to shorten the period for compliance with this order.  Semple is ordered to produce the foregoing documents to Imperati within seven calendar days of this ruling.

The Court overrules Semple's deliberative process privilege and work product objections, but sustains his attorney-client privilege objections, to the production of Documents 4024-80, 4132-81, 4182-4259, 4260-4309, 4313-14, 4326-27 and 4382-4430.  Semple's attorney-client

privilege objections are also sustained with respect to all portions of Document 3961-65 other than the May 19, 2016 e-mail from Nurse Bombard to Dr. Maurer.  Imperati's motion to compel production of these documents is denied accordingly.

This is not a recommended ruling.  This is a non-dispositive discovery ruling that is reviewable pursuant to the "clearly erroneous" statutory standard of review.  *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Conn. L. Civ. R. 72.2.  As such, it is an order of the Court unless reversed or modified by the District Judge in response to a timely objection under Local Rule 72.2(a).  The Court will retain the seventeen documents *in camera* for fourteen days.  If neither party has docketed an objection by then, the Court will arrange for the return of the documents to Semple's counsel.

Dated at Hartford, Connecticut this 3rd day of November, 2020.


*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge