UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JEANNE IMPERATI,                    :
AS ADMINISTRATOR OF                 :
THE ESTATE OF WILLIAM               :
BENNETT,                            :
                                    :
            Plaintiff,              :
                                    :
V.                                  :      3:18-cv-1847(RNC)
                                    :
SCOTT SEMPLE, COMMISSIONER          :
CONNECTICUT DEPARTMENT OF           :
CORRECTION, ET AL.,                 :
                                    :
            Defendants.             :

RULING AND ORDER ON MOTION

FOR SUMMARY JUDGMENT FOR MEDICAL DEFENDANTS

On November 11, 2017, William Bennett, an inmate

in the custody of the Connecticut Department of

Correction ("DOC"), succumbed to complications of

invasive squamous cell carcinoma of the larynx.  His

aunt, Jeanne Imperati, in her capacity as administrator

of his estate, brings this action under 42 U.S.C. §

1983 claiming principally that the defendants'

deliberate indifference to his medical needs in

violation of the Eighth Amendment caused the diagnosis

1

of his cancer to be delayed.  The defendants are Scott
Semple, who served as DOC Commissioner from 2014-2018,
and three people who provided medical care to Bennett:
a medical doctor, Carey Freston; and two nurses, Linda
Oeser and Cynthia L'Heureux ("the medical defendants").[1]
All the defendants have moved for summary judgment.
This ruling addresses the motion as to the medical
defendants.

The 56-page amended complaint ("the complaint")
makes detailed allegations concerning systemic
deficiencies in the medical care provided to DOC
inmates beginning in 1997 when the DOC contracted with
Correctional Managed Health Care ("CMHC"), an affiliate
of the University of Connecticut Health Center, to
provide medical, dental and mental health care to
persons in DOC custody.  It further alleges serial

---

[1] The original complaint alleged deliberate indifference claims
against Oeser; Semple; Johnny Wright, M.D.; William Colon,
Warden; Robert E. Judd, Jr., correctional officer; and Eric
Pensavalle, correctional officer.  Following a motion to
dismiss, the plaintiff was given an opportunity to replead and
add new defendants.  The amended complaint dropped the claims
against Wright, Colon, Judd and Pensavalle and added the claims
against Freston and L'Heureux.

deficiencies in the care provided to Bennett beginning in 2007 and continuing until his death in 2017.  But the heart of the complaint concerns the medical defendants' failure to recognize and address early warning signs and symptoms of throat cancer beginning in March 2016.  The plaintiff's expert witness, Homer Venters, MD, states that the medical defendants' "gross errors," particularly their failure to provide Bennett with timely access to an ear, nose and throat specialist ("ENT"), "significantly increased the length of time [the] cancer grew into the tissues of his larynx and spread more widely, decreasing the likelihood he would respond to treatment and increasing his pain, suffering and risk of death."

An ENT consult was requested for Bennett in June 2016 by defendant Oeser, but it was not approved by CMHC's Utilization Review Committee ("URC").  Under then-existing practice, if CMHC staff believed an outside consult was in order, it was necessary to submit a request for approval to the URC, a panel of

physicians, which could approve the request or reject it and recommend an alternative course of action. Venters states that the URC's refusal to provide Bennett with an ENT consult was an "egregious deficiency."  The plaintiff alleges that the URC's denial was part of a pattern of unreasonable refusals by the URC to approve consults for people who were seriously ill.

The medical defendants contend that they are entitled to summary judgment because a jury could not reasonably find that any of them manifested deliberate indifference to Bennett's medical needs.  In addition, they contend that they are entitled to qualified immunity.  I agree that the evidence does not permit a reasonable inference that any of the medical defendants was deliberately indifferent and on this basis grant the motion for summary judgment.

I.

On December 21, 2015, Bennett was seen by defendant Oeser in the chronic care clinic at the Carl

Robinson Correctional Institution in Enfield, where he
was housed.  Oeser, a highly experienced nurse, was
employed by CMHC as a chronic disease specialist.  She
staffed the chronic care clinic in Enfield one day per
week.  This was her first visit with Bennett.

The chronic care clinic provided medical services
to inmates with chronic conditions such as asthma and
diabetes.  Bennett had a documented history of asthma.
A small albuterol canister had been prescribed for him
to be used in the event of flare-ups of asthma-related
symptoms.

During the visit on December 21, Oeser took a
history from Bennett and learned that he had a history
of smoking, drug use and alcohol use.  He reported
having one asthma attack the previous month.  He was
using less than one small cannister of albuterol a
month.  He was waking up at night with asthma symptoms,
coughing at night, and had decreased tolerance for
exercise, which can trigger asthma symptoms.  But he
was exercising regularly.

Oeser did a physical exam and found that Bennett's heart and lungs were normal.  She also did a peak flow measurement, which can reveal the extent of narrowing of airways in the lungs due to asthma.  Bennett's peak flow of 430 exceeded the goal of 420 for a person his age.

Based on Oeser's discussion with Bennett and the physical exam, she concluded that he was a Level 1 asthmatic, meaning his asthma was mild and intermittent.  Accordingly, she renewed his prescription for an albuterol canister, ordered standard lab tests, and planned to have a follow-up visit with him in 45 to 60 days.

On March 21, 2016, Oeser saw Bennett again at the chronic care clinic.  He reported having an asthma attack the previous month.  He was still using less than one short canister of albuterol per month.  He was no longer waking up at night with asthma symptoms or coughing at night, but he reported "constant throat clearing, especially at night."

Oeser did a physical exam.  Bennett's heart and lungs were normal, his peak flow measurement was 420, and his oxygen saturation level was 99%.  Oeser concluded that his asthma was under good control and his clinical status was stable.  She thought his difficulty with throat-clearing was due to "seasonal allergies."

Oeser prescribed 10 mg of Claritin to relieve Bennett's difficulty with throat clearing.  In addition, she prescribed Asmanex, a steroid inhaler used to control wheezing and shortness of breath, which is appropriate for a Level 2 asthmatic (asthma mild persistent).  She planned to have a follow up visit in 90 days.

On June 6, 2016, Oeser saw Bennett for a third and final time in the chronic care clinic.  He reported having weekly asthma attacks during the previous month.  He also reported having a raspy voice for the past three months plus "mild dysphagia" (difficulty swallowing).  As far as the record shows, neither

symptom had been reported in Bennett's previous visits with Oeser.

Oeser did an "ENT" exam (i.e., she examined Bennett's ears, nose and throat) and noted that it was "WNL" (i.e., within normal limits).  His heart and lungs were normal, and his peak flow measurement was about the same.

Oeser continued to think that Bennett's continued difficulty with throat-clearing was due to allergies, but he said Claritin was not helping so she did not renew the prescription.  Because he reported hoarseness with dysphagia, she decided to order a chest x-ray and submit a request to the URC for approval of a consult with an ear, nose and throat specialist.  An ENT could use a laryngoscope to look deeply into Bennett's throat while he was sedated.  Oeser planned to have a follow up visit in 90 days.

Oeser promptly submitted a request to the URC seeking approval for an ENT consult.  The URC met on a weekly basis to review URC requests, which could number

in the hundreds per week.  At least three members of
the URC panel had to be present to act on a request.
Decisions were made on the basis of information
provided in the request, which included the name of the
patient, the name of the requesting provider,
information concerning the procedure, specialty, or
referral service requested, the priority of the
request, the suspected diagnosis and an explanation of
the need for the specific service requested.  At the
weekly meetings, the URC panel members reviewed and
discussed each request, then voted on whether to
approve the request or deny it with a recommended
alternative course of treatment.  See Camera v.
Freston, No. 18CV1595, 2022 WL 903450, at *5 (D. Conn.
Mar. 28, 2022) (internal citations omitted).

     In support of her request for an ENT consult,
Oeser submitted a "Summary for Consultant":

> 45 [year old] male with [history] of smoking
> and 20 [year] pack history of tobacco,
> marijuana and crack cocaine.  [Patient] has
> [history] of asthma (new to asmanex x 2 mo).
> [Inmate] reports raspy voice (pre-asmanex),
> mild dysphagia, and throat clearing (refusing

nasal steroids).  Concerned that it may be
cancerous, strong family [history] of cancer.
[Chest x-ray] pending.  ENT exam: [Within
Normal Limits].  Formally request ENT
evaluation for same.

On June 8, 2016, the URC reviewed the request.
The request was "Not Approved."  Instead, the URC
recommended "a trial of Claritin and a [Proton Pump
Inhibitor]."  A "PPI" is used to treat gastroesophageal
reflux disease, which can account for difficulty
swallowing.

On June 20, 2016, defendant Freston met with
Bennett in Enfield.  As an employee of CMHC, Freston
was responsible for traveling to DOC facilities to see
patients.  On June 20, he was covering for Oeser, who
had taken medical leave and would not return to duty
until August.

Freston spoke with Bennett about the URC's denial
of the ENT consult, which was recorded in a "URC
Request Response" form.  In accordance with protocol,
Freston had Bennett sign the form indicating that the
two of them had discussed the URC's decision.  At the

bottom of the form, Bennett added a note: "See File - Claritin Tried & Stopped."  Freston went ahead and prescribed Claritin and Protonix, as recommended by the URC.  In Bennett's chart he wrote: "[follow up] 3 months – 'throat.'"

Approximately two months later, Bennett reported to a clinician that he was nearing the end of his sentence and wanted to be able to engage in programming so he could be released at the earliest opportunity, but the programs he wanted were not available in Enfield.  Approximately one month later, he was transferred to Brooklyn CI, which offered the programs he wanted.

On October 19, 2016, Bennett was seen in the medical unit at Brooklyn where he reported, "I still have throat issues."  He was examined by a registered nurse, Beth Shaw.  She noted that he had previously been seen for throat issues and there had been a URC denial of an ENT consult.  She noted that he continued to have a hoarse throat, but there had been some

improvement with Protonix.  He reported having chronic throat pain but no dysphagia.  Shaw placed him on the APRN sick call list.

On October 27, 2016, Bennett was seen by defendant L'Heureux, another highly experienced nurse, in the medical unit at Brooklyn.  This was L'Heureux's first encounter with Bennett.  He was fit and jovial.  He did not report difficulty swallowing or any weight loss. He reported that his uvula was clicking and he had a swollen gland that was relieved with Ibuprofen.  His pharynx was "Within Normal Limits," and his tonsils were not enlarged.  He reported having hoarseness for six months, which can be due to asthma and allergies. He had no sore throat.  She could hear his raspy voice, but he said his "raspiness [was] improving overall." L'Heureux thought his hoarseness could be due to his use of Asmanex, a steroid inhaler that can make people hoarse, or allergies, which also cause hoarseness.  She thought he had laryngopharyngeal reflux disease (LERD), which can cause throat irritation for six months.  She

though he was getting better on Protonix and added a 30-day course of Zantac, which could provide further help with reflux.

On November 23, 2016, Bennett was seen in the Brooklyn medical unit for a complaint of pain in his jaw.  Nurse Shaw attributed the pain to a dental problem, gave him Motrin and referred him for a dental follow-up.

On December 1, 2016, L'Heureux saw Bennett again. His symptoms were not improved, and he reported pain in his throat, so she immediately submitted a request to the URC for an ENT consult.  She provided the following summary:

> 46 yr old man with [history] of asthma/[chronic obstructive pulmonary disease] was heavy smoker 20 yrs[.] Now has 6 [month history] of hoarse voice[.] Seen by dental today molar extracted[.] Uvula very [red] Asmanex was [discontinued] in [October] and [Inmate] had been on protonix and zantac since [J]une[.] Increased protonix today.  URC denied [ENT consult] in June but [Inmate] very concerned about cancer.

The request was pre-approved by a member of the URC panel the next day.

13

On January 10, 2017, Bennett submitted an inmate request form stating, "I just wanted to let you know, my throat still is very problematic.  I am done with necessary programs on January 18th.  Ready, willing and able to get consultation at UConn thereafter."

In mid-January 2017, Bennett's counselor at Brooklyn CI, Elizabeth Cooper, went to the Deputy Warden and reported that Bennett was spitting blood and had searing pain in his throat.  She also contacted medical personnel at Brooklyn CI.

On January 23, 2017, Bennett was transported to Day Kimball Hospital because of significant breathing difficulty.  Imaging revealed a mass in his throat. The ER doctor thought it was malignant and recommended that Bennett see an ENT for a biopsy.

On January 25, 2017, Bennett was taken to UConn's John Dempsey Hospital because of severe difficulty breathing.  An immediate tracheostomy was performed.  A biopsy of the mass in his throat revealed stage IV

squamous cell carcinoma of the larynx, which by then was inoperable.

Bennett died nine months later in November 2017.[2]

## II.

The Eighth Amendment's prohibition of "cruel and unusual punishments," U.S. Const. amend. VIII, is violated when prison officials are deliberately indifferent to an inmate's serious medical needs. Farmer v. Brennan, 511 U.S. 825, 832, 844 (1994); see Estelle v. Gamble, 429 U.S. 97, 103, 105 (1976) (characterizing deliberate indifference as the "wanton infliction of unnecessary pain").  Liability for an Eighth Amendment violation is established by proof that (1) the inmate's medical need was objectively sufficiently serious to support a constitutional claim, (2) the defendant engaged in conduct permitting a

---

[2] All the medical witnesses agree that Bennett had a very aggressive form of cancer.  A defense expert has testified that it was the fastest he has seen.  Viewing the evidence most favorably to the plaintiff, there is a possibility an earlier diagnosis might have helped but not a probability it would have helped.  Defense experts have testified that it was impossible for Bennett to survive such an aggressive form of cancer.

reasonable inference that he or she was deliberately indifferent to a substantial risk of serious harm to the inmate; (3) and the defendant's deliberately indifferent act or omission caused harm to occur.

Based on the parties' arguments, the central question presented by the motion for summary judgment is whether a jury could reasonably find that any of the medical defendants was deliberately indifferent to Bennett's need for an ENT consult.  To answer this question correctly requires an accurate understanding of the deliberate indifference standard of fault.  As shown below, deliberate indifference is the equivalent of criminal recklessness and thus involves a significantly greater degree of culpability than ordinary negligence.

A.  The Deliberate Indifference Standard of Fault

In any action under § 1983, the plaintiff must prove that the defendant acted with the state of mind required to commit the constitutional violation at issue in the case.  A greater degree of culpability

than ordinary negligence is required in all cases, but
actual intent to cause harm is rarely necessary.
Deliberate indifference - a degree of fault that lies
between those two – often applies.

Farmer is the leading precedent on the meaning of
the deliberate indifference standard in prisoner cases
involving claims of inadequate medical care.  Prior to
Farmer, the Supreme Court had decided that to violate
the Cruel and Unusual Punishments Clause, a prison
official must act with a sufficiently culpable state of
mind.  In prison-condition cases the requisite state of
mind was one of deliberate indifference to inmate
health or safety.  Farmer, 511 U.S. at 834.  Applying
the deliberate indifference standard, the Court of
Appeals had equated it with recklessness.  Id. at 836.
In Farmer, the parties agreed that deliberate
indifference was the appropriate standard, and that it
should be equated with recklessness.  But they differed
as to whether a subjective or objective test should
apply.  The petitioner urged the Court to define

17

deliberate indifference as civil-law recklessness, which incorporates an objective test; the respondent urged that deliberate indifference be defined in the same way as recklessness in the criminal law, which incorporates a subjective test.  The Deputy Solicitor General "advised against frank adoption of a criminal-law mens rea requirement, contending that it could encourage triers of fact to find liability only if they concluded that prison officials acted like criminals." Id. at 839.

The Court observed that "[i]t is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding the risk."  Id. at 836.  It then opted for a subjective test of recklessness stating, "subjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference'

under the Eighth Amendment." Id. at 839-40.[3]  The Court
continued: "Under the test we adopt today, an Eighth
Amendment claimant need not show that a prison official
acted or failed to act believing that harm actually
would befall an inmate; it is enough that the official
acted or failed to act despite his knowledge of a
substantial risk of serious harm."

Id. at 842.

   The opinion in Farmer did not attempt to quantify
the degree of risk required for a risk of serious harm
to be sufficiently "substantial" to support a finding

---

[3] The Court explained its reasons for declining to adopt an
objective test:

>     The Eighth Amendment does not outlaw cruel and unusual
>     "conditions"; it outlaws cruel and unusual
>     "punishments."  An act or omission unaccompanied by
>     knowledge of a significant risk of harm might well be
>     something society wishes to discourage, and if harm
>     does result society might well wish to assure
>     compensation.  The common law reflects such concerns
>     when it imposes tort liability on a purely objective
>     basis.  But an official's failure to alleviate a
>     significant risk that he should have perceived but did
>     not, while no cause for commendation, cannot under our
>     cases be condemned as the infliction of punishment.

Farmer, 511 U.S. at 837-38 (internal citations omitted).

of deliberate indifference.  However, under Model Penal
Code § 2.02, which the Court cited approvingly in
Farmer, "[the] risk must be of such a nature and degree
that . . . its disregard involves a gross deviation
from the standard of conduct that a law-abiding person
would observe in the [defendant's] situation.[4]

Since Farmer, the Supreme Court has not addressed
the degree of risk required to support an Eighth
Amendment claim of deliberate indifference.  But in
other contexts where deliberate indifference is the
standard of fault, the Court has clarified that
deliberate indifference involves a higher degree of
fault than gross negligence.  See City of Canton v.
Harris, 489 U.S. 378, 387-89, 388 n.7 (1989) (adopting
deliberate indifference rather than gross negligence as

---

[4] Section 2.02(c) provides in full:

> A person acts recklessly with respect to a material
> element of an offense when he consciously disregards a
> substantial and unjustifiable risk that the material
> element exists or will result from his conduct.  The
> risk must be of such a nature and degree that,
> considering the nature and purpose of the actor's
> conduct and the circumstances known to him, its
> disregard involves a gross deviation from the standard
> of conduct that a law-abiding person would observe in
> the actor's situation.

the standard to govern failure-to-train claims against
municipalities).  Moreover, the Court has clarified
that in deliberate indifference cases involving a
defendant's failure to act to protect another against a
risk of physical harm, the defendant's subjective
awareness of a high degree of risk must be shown; the
need for action must be "plainly obvious" and the
harmful consequence of inaction "highly predictable."
See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520
U.S. 397, 409-10, 421 (1997) ("[T]he record in this
case is perfectly sufficient to support the jury's
verdict even on the Court's formulation of the high
degree of risk that must be shown.") (Souter, J., and
Stevens and Breyer, JJ., dissenting).

In accordance with existing Supreme Court
precedent, the Second Circuit has stated that the
deliberate indifference standard requires actual
knowledge and disregard of a "high degree of risk of
physical harm."  Poe v. Leonard, 282 F.3d 123, 140 n.14
(2d Cir. 2002).  In Poe, the Court reversed a denial of

qualified immunity for a supervisor because the
plaintiff failed to adduce sufficient evidence that the
supervisor's inaction manifested deliberate
indifference to a high risk that a subordinate would
violate the plaintiff's rights.  Id.[5]

In support of its statement that deliberate
indifference requires disregard of a high degree of
risk of physical harm, the Court cited § 500 of the
Restatement (Second) of Torts.  The updated version of
this section provides the following definition of
"reckless disregard of the safety of another":

> [An] actor's conduct is in reckless disregard
> of the safety of another if he does an act or
> intentionally fails to do an act which it is
> his duty to the other to do, knowing or having
> reason to know of facts which would lead a
> reasonable man to realize, not only that his
> conduct creates an unreasonable risk of
> physical harm to another, but also that such
> risk is substantially greater than that which
> is necessary to make his conduct negligent.

---

[5] In Poe, the Court noted that deliberate indifference and gross
negligence "represent different degrees of intentional conduct
on a continuum" in that they "involve different degrees of
certainty, on the part of the actor, that negative consequences
will result from his act or omission."  Id. at 140 n.14
(internal citation omitted).

Restatement (Second) of Torts § 500 (Am. L. Inst. 1965).

Under this section of the Restatement, a person acts recklessly if he or she knows of facts that "create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." Id. cmt. a.  To be reckless, conduct "must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence."  Id.

The Restatement distinguishes between recklessness and other forms of culpable conduct. Whereas intentional misconduct requires an intent to cause harm in circumstances making it substantially certain harm will occur, reckless misconduct requires the actor to act or fail to act despite knowing of "a strong probability that harm may result."  Id. cmt. f. Reckless misconduct differs from "mere inadvertence,

incompetence [and] unskillfulness." Id. cmt. g.
Unlike these forms of ordinary negligence, recklessness
"requires a conscious choice of a course of action,
either with knowledge of the serious danger to others
involved in it or with knowledge of facts which would
disclose this danger to any reasonable man." Id. To
be reckless, an actor "must recognize that his conduct
involves a risk substantially greater in amount than
that which is necessary to make his conduct negligent."
Id. The difference between reckless misconduct and
negligence "is a difference in the degree of the risk,
but this difference of degree is so marked as to amount
substantially to a difference in kind." Id.

In this case, then, to prevail on her Eighth
Amendment deliberate indifference claim against a
defendant, the plaintiff must prove that the defendant
was subjectively reckless, in that he or she was aware
of a "high degree of risk of physical harm" to Bennett
if he did not receive an ENT consult, and deliberately
failed to take steps to ensure that he received one

despite the "strong probability" that physical harm
would occur.[6]  The risk of serious harm must have been
"plainly obvious" or "easily perceptible"; the
defendant must have actually appreciated the risk; the
defendant must have failed to act in conscious
disregard of, or callous indifference to, the risk; and
the defendant's deliberately indifferent failure to act
must have caused "highly predictable" harm to occur.
See also Youngberg v. Romeo, 457 U.S. 307, 323 (1982)
(medical malpractice can support a reasonable inference
of deliberate indifference "only when the decision by
the [medical] professional is such a substantial
departure from accepted professional judgment,
practice, or standards as to demonstrate that the
person responsible actually did not base the decision
on such a judgment.").

B.  The Summary Judgment Standard

---

[6] Claims based on denial or delay in providing medical care
require the factfinder to focus on the particular risk of harm
faced by the prisoner due to the delay, rather than the severity
of his underlying condition.  Smith v. Carpenter, 316 F.3d 178,
186 (2d Cir. 2003).

The rule governing summary judgment provides: "The court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Only disputes over facts that might legitimately affect the outcome under governing law are material.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.  In applying this test, the evidence must be viewed in a manner most favorable to the nonmoving party.  Evidence favorable to the non-moving party that could be credited by a jury must be

credited by the court in ruling on the motion, and the
nonmoving party must be given the benefit of all
reasonable inferences supported by the evidence.

In accordance with these principles, summary
judgment may be granted on a claim against a defendant
if the evidence in the record, viewed fully and most
favorably to the plaintiff, is insufficient to
establish that the defendant acted with deliberate
indifference to Bennett's serious medical needs.  The
sufficiency of the evidence must be analyzed separately
as to each defendant.

APRN Oeser

Defendant Oeser argues that she is entitled to
summary judgment because the plaintiff's allegations as
to her sound in negligence, rather than deliberate
indifference.  She states that she "provided adequate
medical care during her limited interactions with Mr.
Bennett."  She conducted targeted physical exams of his
ears, nose, throat, and lungs, all of which were
normal.  She conducted peak flow measurements to assess

his asthma, considered differential diagnoses, and
prescribed various forms of treatment to address his
conditions.  When he reported difficulty with throat-
clearing, she thought he had allergies and prescribed
Claritin.  When he reported having a raspy voice for
three months and mild difficulty swallowing, she
performed an ENT exam as best she could and promptly
submitted a URC request for an ENT consult.  She then
went out on medical leave.

In opposing summary judgment for Oeser, the
plaintiff points to Dr. Venters' report, which states
in relevant part:

> Mr. Bennett presented several months of
> progressive throat symptoms that combined with
> his well-documented risk factors for laryngeal
> cancer (tobacco use and alcohol use), should
> have caused prompt evaluation by [an] ENT for
> potential malignancy.  By the time that the
> initial referral for [an] ENT was made in June
> of 2016, Mr. Bennett had already reported
> months of symptoms.  The appropriate response
> would have been for the NP (Oeser) caring for
> Mr. Bennett to obtain standard elements of a
> history of present illness including the time
> course of symptoms, aggravating and relieving
> factors, associated signs and symptoms, and
> review [of] relevant social and family history.
> Had this approach been taken, staff would have

learned of the parallel evolution of difficulty
swallowing and increasingly hoarse voice, along
with a family history of cancer and strong
history of ETOH abuse and tobacco use by Mr.
Bennett.  The presence of difficulty swallowing
(dysphagia) is especially concerning because
this can be a symptom of early neurological
disease as well as tumor growth in the throat.
While less serious causes of dysphagia exist,
as soon as this symptom is detected or
reported, swift assessment by an ENT physician
is mandatory.  The denial of the initial
referral for ENT evaluation and substitution of
Claritin and a proton pump inhibitor by the URC
panel is an equally egregious deficiency and
calls into question the clinical competence of
the process.  In addition, when the URC denied
Mr. Bennet his clearly needed ENT evaluation,
facility staff (Oeser) should have appealed the
decision given how concerning Mr. Bennett's
profile was in June of 2016.

In light of Venters' report, the claim against

Oeser is based on (1) her failure to request an ENT

consult prior to June 6, 2016; (2) her failure to

prepare a work-up describing a parallel evolution of

difficulty swallowing and increasing hoarseness; and

(3) her failure to appeal the URC denial.  These

omissions, viewed singly and in combination, do not

support an Eighth Amendment claim.

Oeser's failure to request an ENT consult prior to
June 6, 2016, did not violate the Eighth Amendment.
See Camera, 2022 WL 903450, at *14 ("[T]he evidence
reflects that Dr. Freston took Mr. Camera's complaints
seriously, treated those complaints, and when
necessary, escalated Mr. Camera's treatment.").  The
medical record shows that Bennett did not report a
raspy voice or difficulty swallowing until the visit of
June 6.[7]  Once he reported these symptoms, Oeser
immediately prepared the URC request for an ENT
consult.

Oeser's failure to document a parallel evolution
of difficulty swallowing and increasingly hoarse voice
did not violate the Eighth Amendment.  As far as the
medical record shows, Bennett reported neither symptom
to Oeser until June 6, 2016, at which time he reported
having a raspy voice for 3 months and provided no

---

[7] The plaintiff points to an entry in a dental record showing
that Bennett reported hoarseness in February but there is no
evidence Oeser had access to the dental record nor any
indication that Bennett told Oeser about having hoarseness in
February.

information as to when he began to have difficulty swallowing.[8]

Viewing the record most favorably to the plaintiff, a jury could find that the standard of care required Oeser to inform the URC that Bennett reported having difficulty swallowing for the past three months.  But that omission does not support a reasonable inference that Oeser was callously indifferent to Bennett's medical needs.  If anything, her request to the URC, quoted verbatim earlier, compels the inference that she recognized Bennett's need for an ENT consult in light of his newly reported symptoms and did what she could to obtain one for him without delay.[9]

---

[8] The plaintiff points to an entry in the medical record showing that a strep culture was taken in May and turned out negative. The plaintiff argues that this supports an inference that Bennett must have been complaining about a problem with his throat at that time. But the reason for the strep culture is not shown by the record.

[9] Oeser has testified that she requested an ENT consult, even though her ENT exam was "within normal limits, because "if you have new onset dysphagia and dysphonia there's a concern something isn't right."  Though her exam was normal, she could not "see deeper into the throat," which required "special equipment like a laryngoscope," and Bennett "would need to see a specialist for that because sometimes [patients undergoing laryngoscopy] need to be sedated."

Oeser's failure to appeal the URC's denial did not violate the Eighth Amendment.  It is undisputed that she did not learn about the denial because she went on medical leave soon after her visit with Bennett on June 6, and did not return until mid-August.  The plaintiff contends that when she returned from leave she had a duty to follow up on the URC request because she previously had been Bennett's primary care provider and knew he could fall through cracks in a broken system.[10] The evidence does not support a finding that Oeser could not reasonably rely on others to follow up on her URC request.  Even assuming that were so, her failure to follow-up after she returned from leave was at worst negligent.  See Singletary v. Russo, 377 F. Supp. 3d 175, 193-94 (E.D.N.Y. 2019) ("Even if, as Dr. Finkel contends, it was professionally irresponsible for Dr. Geraci not to follow up on the referral to sick call, nothing suggests that Dr. Geraci was reckless. . . . Absent any indication that Dr. Geraci was reckless, as

---

[10] There is no allegation or evidence that she owed Bennett a duty of care while on leave.

opposed to merely negligent, in failing to ensure that
Singletary was eventually seen by a doctor, plaintiff's
claim cannot, and does not, survive summary
judgment."); Hernandez v. N.Y. State Dep't of Corr.,
No. 97 CV 1267 SC, 2000 WL 34239139, at *6–7 (S.D.N.Y.
Nov. 28, 2000) (the defendant was not deliberately
indifferent in "fail[ing] to follow up to make sure
that Plaintiff received a particular form of physical
therapy" because "[t]here was a complete absence of
evidence sufficient to find that [the defendant] was
deliberately indifferent" as opposed to merely
negligent), aff'd sub nom. Hernandez v. Keane, 341 F.3d
137 (2d Cir. 2003); Kemp v. Wright, No. 01 CV 562
(JG), 2005 WL 893571, at *6 (E.D.N.Y. Apr. 19, 2005)
("Dr. Halko's failure to follow-up sooner on the
referral did not 'evince[ ] a conscious disregard of a
substantial risk of serious harm.'") (citing Hernandez,
341 F.3d at 144); Irving v. Lantz, No. 3:08CV200(PCD),
2010 WL 2794075, at *3 (D. Conn. July 12, 2010)
("[Plaintiff's] only argument supporting indifference

is that Defendant did not follow-up to ensure that
Plaintiff received his medication.  Defendant's actions
could not even constitute negligence; they certainly do
not rise to the level of an Eighth Amendment claim.");
Oh v. Saprano, No. 3:20-CV-237 (SRU), 2020 WL 4339476,
at *6 (D. Conn. July 27, 2020) ("Even if RN Tutu should
have followed up on [plaintiff's] requests to ensure
that [he received his referral], her failure to do so,
at most, constituted negligence, which cannot support
an Eighth Amendment deliberate indifference claim.").

    In short, the evidence is insufficient to permit a
jury to reasonably find that Oeser was deliberately
indifferent to Bennett's need for an ENT consult.
Accordingly, summary judgment will be granted
dismissing the claim against her.

Dr. Freston

    Defendant Freston argues that he is entitled to
summary judgment because the plaintiff's allegations
sound in negligence rather than deliberate
indifference.  He contends that the plaintiff, using

20/20 hindsight, faults him for misinterpreting
Bennett's difficulty swallowing as a sign of reflux,
which is categorically different than deliberate
indifference.  As shown by his entries in the medical
record, when he examined Bennett on June 20, Bennett
was not in distress.  Bennett reported a problem with
throat-clearing but not dysphagia.  He weighed 211
pounds and reported no weight loss.  His vitals were
normal.  His lymph nodes were normal.  He had mucus in
the back of his throat consistent with post-nasal drip
(PND).  His swallowing was within normal limits.  His
difficulty with throat-clearing and possible dysphagia
were not red flags for an ENT consult because they more
likely are symptoms of a gastrointestinal problem than
an ENT problem.  Bennett's throat-clearing was not
alarming and could be due to PND or gatroesophageal
reflux disease.  Freston thought a trial of Claritin
and a PPI could resolve Bennett's PND and acid reflux.
If he still had hoarseness with no PND and no acid
reflux, then an ENT consult would be required.  He

planned to follow up on Bennett's difficulty with his throat in 90 days.

The plaintiff responds that Freston's visit with Bennett on June 20, evinces deliberate indifference because Freston went along with the URC's denial of an ENT consult either by voting to not approve the consult as a member of the URC panel or by failing to appeal.[11] In Dr. Venters' words, the denial was "an egregious deficiency," and facility staff "should have appealed [it] given how concerning Mr. Bennett's clinical profile was in June of 2016."  Instead, Freston simply "continued the course of treatment Mr. Bennett had been receiv[ing], despite [Bennett's] written protestations on the URC form that he had already had Claritin to no avail."[12]

---

[11] Freston has testified that he could have been part of the panel that reviewed Oeser's request, but he does not recall whether he was or not.

[12] The plaintiff argues that Freston "should have approached Mr. Bennett's case with more diligence and suspicion" because of his involvement in a previous case in which the URC's failure to approve an outside consult delayed a cancer diagnosis.

Viewing Venters' report most favorably to the plaintiff, a jury could find that the standard of care required a swift assessment by an ENT because difficulty swallowing "can be a symptom of early neurological disease as well as tumor growth in the throat."  On this basis, Freston's failure to take precautionary steps to ensure that Bennett received an ENT consult could be deemed negligent.  But the issue here is whether his failure to do so permits a reasonable inference of deliberate indifference prohibited by the Eighth Amendment.  The record evidence is insufficient to support such an inference with regard to Freston.

It is undisputed that the URC's initial denial of an ENT consult was based on a mistaken belief that Bennett's raspy voice and difficulty swallowing, reported to Oeser on June 6, could be due to allergies and gastric reflux.  Implicit in the URC's recommended alternative course of treatment was an erroneous assumption that a further trial of Claritin, together

with a PPI, could effectively address Bennett's symptoms.[13]  Dr. Venters' report, viewed most favorably to the plaintiff, does not support a reasonable finding that the URC's alternative course of treatment lacked any medical basis.

Venters' characterization of the URC denial as an "egregious deficiency" suggests that any delay in providing an ENT consult for Bennett was a clear violation of the standard of care because "difficulty swallowing can be a symptom of early neurological disease as well as tumor growth in the throat."  The report provides no information concerning this possibility beyond the fact that it existed.  That difficulty swallowing "can be a symptom of early neurological disease as well as tumor growth in the throat" does not support a reasonable inference that Freston consciously ignored a "high risk" of a tumor in

---

[13] The plaintiff emphasizes that Dr. Freston is the only doctor who thinks the URC's denial was appropriate.  As the defendants point out, however, even assuming Freston served on the panel of physicians that considered the initial URC request, no member of the three-physician panel dissented from the denial.

callous indifference to a "strong probability" that delaying an ENT consult would cause "highly predictable" harm.

Delay in providing necessary medical care may violate the Eighth Amendment in some instances. Hernandez, 341 F.3d at 146; Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).  The Second Circuit "has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, see Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984); ignored a 'life-threatening and fast-degenerating' condition for three days, Liscio v. Warren, 901 F.2d 274, 277 (2d Cir. 1990); or delayed major surgery for over two years, see Hathaway v. Coughlin, 841 F.2d 48, 50-51 (2d Cir. 1988)."  Demata v. N.Y. State Corr. Dep't of Health Servs., 198 F.3d 233, 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999). Negligent failure to properly diagnose an illness or recognize the urgency of a condition does not fall into this category.  See Harrison v. Barley, 219 F.3d 132,

139 (2d Cir. 2000).  Nor does disagreement about the
need for specialists or the timing of their
intervention.  Camera, 2022 WL 903450, at *12 (summary
judgment granted to URC physicians because no evidence
they were aware that patient faced serious risk of harm
from extremely rare sinonasal cancer and deliberately
ignored it).

As in the Camera case, the evidence discloses no
conduct by Freston that elevates the case from one of
possible medical malpractice to one involving a
violation of the Eighth Amendment.  See Camera, 2022 WL
903450, at *19.  There is no allegation or evidence
that he delayed an ENT consult for ulterior motives or
that Bennett's condition was fast-degenerating or life-
threatening, or that delaying a follow-up visit for 90
days rose to the egregious level of the two-year delay
in Hathaway.[14]

_____

[14] Defense experts have testified that difficulty with throat-
clearing at night when lying down and difficulty swallowing are
symptoms of PND, allergies, reflux and possibly cancer.  It is
therefore reasonable to have a 90-day trial of medication that
might help before referring the patient to an ENT.

On the existing record, a jury could not
reasonably find that Freston was deliberately
indifferent to Bennett's needs in violation of the
Eighth Amendment.  The evidence does not support
reasonable findings that delaying an ENT consult
pending a further trial of Claritin combined with a PPI
carried a "high risk of physical harm" to Bennett; that
the risk was "plainly obvious" or "easily perceptible";
that Freston appreciated the risk; that he deliberately
failed to take steps to get an ENT consult for Bennett
despite knowing there was a "strong probability" delay
would cause him serious harm; and that his inaction
caused "highly predictable" harm to occur.  See
Salahuddin v. Goord, 467 F.3d 263, 282 (2d Cir. 2006)
(prison doctor was not deliberately indifferent in
failing to urge a particular course of treatment
because no one had "aroused [his] suspicion" that not
allowing the treatment to proceed "would be seriously
harmful"); Young v. Choinski, 15 F. Supp. 3d 172, 182
(D. Conn. 2014) ("The fact that a prison official did

not alleviate a significant risk that he <u>should have</u>
<u>but did not perceive</u> does not constitute deliberate
indifference.") (citing <u>Farmer</u>, 511 U.S. at 838).
Accordingly, Freston is also entitled to summary
judgment.

<u>APRN L'Heureux</u>

Defendant L'Heureux argues that she is entitled to
summary judgment because she provided adequate medical
care on the two occasions she treated Bennett.  She
spoke with him about his symptoms, reviewed his medical
records, and performed examinations of his pharynx,
lymph nodes and lungs.  She "prescribed medication in
accordance with her diagnoses" and "used her medical
judgment and experience to come to this diagnosis and
treatment plan."  She also ordered an ENT consult as a
result of the second examination, which was approved.
The allegations that she should have used a higher
index of suspicion and should have followed-up to
ensure Bennett was seen by an ENT sound in negligence
not deliberate indifference.

The plaintiff responds that L'Heureux's "investigation into Mr. Bennett's health issues was again substandard." When she saw Bennett in October 2016, four months after the URC's denial, she failed to recognize that an ENT consult was required by the standard of care. She requested an ENT consult two months later, got approval, then failed to follow up.

In support of the claim against L'Heureux, Dr. Venters' report states:

> [The] lack of attention to Mr. Bennett's serious medical concerns was compounded at . . . sick call encounters on 10/19/16, 10/27/16 and 11/23/16. Only on 12/1/16, after repeatedly eliciting and failing to act on progressive, systemic complaints that raised clear concerns for malignancy or other serious medical problem did medical staff resubmit the referral for [an] ENT to the URC. This referral appears [to have been] prompted in large part by Mr. Bennett's own articulation of his fear that he was suffering from untreated cancer.

L'Heureux replies that her failure to ensure that Bennett was seen by an ENT did not violate the Eighth Amendment. She saw him for the first time on October 27. One week earlier, he had been seen by Nurse Shaw,

who noted that he had chronic throat pain, but his
hoarseness had improved with Protonix, and he had no
dysphagia.  When L'Heureux saw him, his pharynx was
"Within Normal Limits"; his "raspiness [was] improving
overall"; and he had a swollen gland that was relieved
with Ibuprofen.  She thought he had LERD and was
getting better.  When she next saw him on December 1,
his symptoms were not improved and he reported throat
pain, so she immediately submitted the URC request for
an ENT consult, which was approved.

The record evidence does not support a reasonable
inference that L'Heureux was deliberately indifferent
in violation of the Eighth Amendment.  There is no
evidence of an act or omission on her part that permits
a reasonable inference of deliberate indifference to
Bennett's need for an ENT consult.  In particular,
there is no evidence that when she saw Bennett on
October 27, she knew he faced a high degree of risk of
physical harm if he did not get an urgent ENT consult
and deliberately ignored the risk.  Given the

44

information available to her, such a risk was not
plainly obvious or easily perceptible.  When she saw
him On December 1, she immediately requested an ENT
consult, and it was approved the next day.  Her failure
to follow-up to ensure that he received an ENT consult
does not manifest deliberate indifference.  Such a
finding would require evidence that she consciously
chose not to follow-up despite being aware of a strong
probability that unless she did so he would suffer
highly predictable harm.  The evidence is insufficient
to support such a finding.  See Camera, 2022 WL 903450,
at *17-18 ("[T]o the extent plaintiff contends that Dr.
Ruiz failed to adequately prioritize the URC requests,
the record does not establish that any such delay rises
to the level of a constitutional violation. . . . There
is simply no relevant, admissible, evidence to support
a finding by a reasonable jury that the URC request
'was made with the requisite mental state – i.e.,
something more than mere negligence, akin to criminal
recklessness.'") (quoting Butler v. Furco, 614 Fed.

Appx. 21, 23 (2d Cir. 2015)); Kemp, 2005 WL 893571, at
*6 ("Dr. Halko's failure to follow-up sooner on the
referral did not 'evince[ ] a conscious disregard of a
substantial risk of serious harm.'"); Irving, 2010 WL
2794075, at *3  ("Plaintiff never informed Defendant of
the delay in receiving his medication and Defendant has
no independent duty to ensure that the pharmacy
distributes medicine quickly.  Defendant fulfilled all
his duties wi[th] apparent care and caution.").
Accordingly, like the other medical defendants,
L'Heureux is entitled to summary judgment.

                          III.

     For the foregoing reasons, the motion for summary
judgment is hereby granted as to the medical
defendants.

     So ordered this 7th day of May 2024.


                         _____/s/ RNC_____
                         Robert N. Chatigny
                         U.S. District Judge